*In re* KELLOGG.

INSANE PERSONS—INQUISITION—QUESTION FOR JURY.

> Where an inquisition in the probate court to determine a party's competency and appoint a guardian, if there is any testimony, on appeal to the circuit court, tending to support the jury's finding of incompetency, the evidence will not be weighed by the Supreme Court, and the case will be remanded. BIRD, MOORE, and BROOKE, JJ., dissenting.

Error to Kent; Perkins, J. Submitted October 25, 1916. (Docket No. 109.) Decided May 31, 1917.

Petition in probate court by William Kellogg for the appointment of a guardian of the person and estate of Lafayette Kellogg, alleged incompetent. From an order granting the prayer of the petition, said defendant appealed to the circuit court. Judgment for petitioner. Defendant brings error. Affirmed.

*H. Monroe Dunham* and *John M. Dunham,* for appellant.

*Smedley & Linsey,* for appellee.

BIRD, J. (*dissenting*). Application was made in the probate court for the county of Kent, alleging that Lafayette Kellogg was not mentally competent to have the care and custody of his person and estate, and praying that a guardian be appointed. An appointment was made by the probate court, and the alleged incompetent appealed therefrom to the circuit court, where the matter was tried before a jury, and they returned a verdict in keeping with the conclusion of the probate court. We are now called upon to review the proceedings had in the circuit court.

Several errors are alleged, but we think the important one is whether there was testimony which

justified the trial court in submitting the case to the jury. The record discloses that Lafayette Kellogg owned, until recently, a small farm of 40 acres in the township of Byron, Kent county, and that he had resided thereon for many years with one of his brothers, keeping "bachelors' hall." The testimony of the neighbors, in substance, shows that Lafayette Kellogg is 65 years of age, without much education, not very industrious, and very untidy in his personal appearance and about his home; that at times he is moody and says little, and at other times very social when people call at his home; that he is easily influenced by sympathy extended to him, and he is afraid of thunder storms; that he is not a good business man, made some poor deals, and sold his farm for $3,000, when he could have obtained at least $500 more; that at times he is quarrelsome; and that his brother Hamilton died in the insane asylum.

We think this testimony fails to bring the case within the statute. It is possible for a man to be a poor housekeeper, an indifferent farmer, untidy about his person and home, somewhat quarrelsome at times, occasionally make a bad business deal, have moods when he is unsocial, be subject to generous impulses when sympathized with, and still be competent to manage his own person and estate. Because he has not measured up to the standard of living possessed by his neighbors is no cause for depriving him of the control of his person and property.

It was said in Re Guardianship of Storick, 64 Mich. 685 (31 N. W. 582), in construing the statutes under which these proceedings were instituted, that:

"It does not refer to persons who are sane, but not, perhaps, as wise or intelligent as some other persons. It applies to one whose mind is so affected as to have lost control of itself to such a degree as to deprive the person afflicted of sane and normal action. * * * Persons who can be safely trusted with taking care

of themselves are seldom, if ever, liable to guardianship. One may be so sick or crippled as to be compelled to leave his affairs in the hands of servants or agents, and is no more incompetent for that reason than a very wealthy man is who cannot possibly look after the details of his business. Neither is there any legal standard of business wisdom. Men may be unwisely speculative or unwisely penurious, but this is not insanity. A jury of merchants might very easily approve or disapprove where a jury of persons unaccustomed to commercial ventures and expenditures would think the reverse. Every man may spend or save as he chooses, so long as he does not come within the prohibitions of law. As long as he possesses a mind normally sound, he is entitled to free agency. It is as cruel and unlawful to interfere with the liberty of the old as of any one else, and the law cannot favor or permit this liberty to be diminished."

Up to the time this application was made, Lafayette Kellogg appears to have taken care of himself and managed his own affairs with such aid as people of very limited education and business capacity usually invoke from others. He may be mentally incompetent and in need of a guardian, but he should not in my opinion be so adjudged upon this record. Dr. De Haan's testimony comes nearer making a case for the jury than the testimony of any other witness. The doctor, who had been two years in the practice, testified that he had seen Mr. Kellogg on two occasions, one of which times he had prescribed for him, that he had not seen him for quite awhile, but the last time he saw him thought "he had passed the ordinary stages of *senile dementia.*" *Senile dementia* is generally understood to be a progressive disease. The doctor's failure to explain what the "ordinary stages" were leaves the layman in some doubt as to his real condition. One might be passing into a stage of *senile dementia,* and yet be able to care for himself and attend to a limited amount of business. But whatever was meant, it is useless to speculate with opinion evi-

dence, whether he was mentally competent to care for himself and manage his own affairs in the face of petitioner's own testimony that he did care for himself and manage his own affairs with the assistance that such people usually receive from others. *Spratt v. Spratt*, 76 Mich. 384 (43 N. W. 627).

The record is rather persuasive that some of the neighbors who have been active in initiating these proceedings were desirous of buying Lafayette's 40, and were somewhat disappointed when they learned that he had sold it to Mr. Swanson. These proceedings were instituted a few days after the premises were sold to Mr. Swanson. It is suggested by counsel that it was the contest for the purchase of the 40 which set these proceedings in motion. What the real motive may have been is not very important, in view of the conclusion that the testimony taken as a whole did not make a case for the jury. The judgment of the circuit court should be reversed and set aside. The defendant should recover his costs against the petitioner.

MOORE and BROOKE, JJ., concurred with BIRD, J.

OSTRANDER, J. This is an inquisition. It is for the probate judge, and if, on appeal, a jury is demanded, then it is for a jury to determine the fact of competency or incompetency. The probate judge found that Mr. Kellogg was mentally incompetent to take care of himself and manage his property, and in the circuit court a jury answered in the affirmative these two questions:

Was Lafayette Kellogg on April 3, 1915, mentally incapable of taking care of himself and managing his property?
Is Lafayette Kellogg now mentally incapable of taking care of himself and managing his property?

If there was any testimony tending to support these

findings of the jury, this court has nothing to do but remand the case.

"We can no more weigh the evidence in a case when a jury has determined the question than in a case where the court has determined it. We must not be understood as holding that, if there is no testimony showing mental incapacity, that question might not be reviewed in this court by writ of error from the circuit court; but in such case the court must have before it the entire testimony, from which it must conclusively appear that there was no evidence showing incapacity." *In re Phillips,* 154 Mich. 139, 141 (117 N. W. 630).

There was some testimony tending to prove mental incapacity of Mr. Kellogg—some besides that which is referred to in the opinion of Mr. Justice BIRD. It is an undisputed fact that the property which Kellogg sold for $3,000 was worth from $3,800 to $4,000. Dr. De Haan testified, also, that Kellogg had the typical apathetic face of senility.

I think we are bound to say that there was some testimony to support the conclusion reached in the court below.

KUHN, C. J., and STONE and STEERE, JJ., concurred with OSTRANDER, J. PERSON, J., did not sit.