## HENDERSON v. HENDERSON.

GUARDIAN AND WARD—COMPETENCY—EVIDENCE—SUFFICIENCY.

In proceedings to have plaintiff's guardian discharged, and to have plaintiff declared mentally competent to have the care, custody, and management of his estate, evidence examined, and *held*, sufficient to support the finding of the jury that plaintiff was mentally incompetent.

Error to Cass; Des Voignes, J. Submitted January 15, 1919. (Docket No. 10.) Decided May 29, 1919.

Petition by Milton A. Henderson against Harley Henderson for the removal of defendant as his guardian under 3 Comp. Laws 1915, § 13950. The petition was denied in the probate court, and plaintiff appealed to the circuit court. Judgment for defendant. Plaintiff brings error. Affirmed.

*C. E. Cone* and *C. M. Lyle*, for appellant.

*Elias P. Harmon* and *Thomas J. Cavanaugh*, for appellee.

On opinion evidence by nonexpert as to contractual or testamentary capacity in lunacy proceedings, see note in 37 L. R. A. (N. S.) 598.

STEERE, J.   Plaintiff began this proceeding in the probate court of Cass county to obtain discharge of defendant as his guardian, the issue being whether since put under guardianship plaintiff has recovered from the infirmities then found by the probate court and is now mentally competent to have the care, custody and management of his estate.   The petition for appointment of a guardian over him was filed in the probate court on September 16, 1915, under provisions of the statute authorizing such course in case of persons who by reason of old age or disease are mentally incompetent to have the care and custody of their estate (3 Comp. Laws 1915, § 13950).   Plaintiff at that time made no objection to the proceeding.   An order was made for personal service on plaintiff, Milton A. Henderson, and William Henderson, his son, then living with him, fixing the date of hearing October 1, 1915; personal service was made on William, September 17, and service was accepted in writing by plaintiff on September 16.   On October 1, 1915, a hearing was had before the probate court at which all parties in interest were present and the said Milton A. Henderson was adjudged mentally incompetent under the statute.   Defendant Harley Henderson, his son, was appointed guardian.

While plaintiff makes certain somewhat random and querulous complaints of his guardian's conduct, his chief contention is that he has a right and is perfectly competent to control and manage his own property, his express comparative estimate being, "I know more than both of my d—d boys."   The record fairly shows that defendant has honestly and faithfully conserved and improved the condition of his father's estate, acting with the approval and under the direction of the probate court, and has provided for his father's care and needs out of the income to the extent plaintiff would accept.   He secured a good home for his father

in Porter township in the vicinity of the old home in the community where the father desired to be. Of this plaintiff says, "I was there four years," and "I had a good home, perfectly satisfactory to me until last year."

In August, 1917, plaintiff left this home which had been provided for him by his guardian and went to the home of a family named Conkright some 15 miles away, a member of that family going after him at his request without the knowledge or consent of defendant, and on August 25, 1917, he filed a petition in the probate court of Cass county setting out the appointment of defendant as his guardian because of his mental incompetency, stating that defendant had acted as such guardian since his appointment, and concluding:

"Your petitioner further shows that he has now recovered from the mental infirmities he might have had at the time his said guardian was appointed and that he is now fully restored to soundness of mind.

"Your petitioner therefore prays that he may be declared by the finding or order of this court to be restored to soundness of mind, and his guardian discharged, pursuant to the statute in such cases made and provided."

After a full hearing upon this petition in the probate court, the same was denied. Appeal was thereupon taken to the circuit court of Cass county, where a trial by jury lasting some four days resulted in a verdict "That said petitioner, Milton A. Henderson, is mentally incompetent to have the care, custody and management of his estate." Upon which verdict judgment was rendered, and the case brought here for review upon numerous assignments of error.

Milton A. Henderson, plaintiff, is, or was at the time of this trial, about 77 years old and a veteran of the civil war. Before age and rheumatism disabled him his life work was farming. Since 1873 he

has resided most of the time in the township of Porter, Cass county, some 18 miles southeast of Cassopolis, on an 80 acres of land which he early secured and settled upon, and yet owns. As the result of improvements made by him and general enhancement of values the farm is now said to be worth about $6,000. His wife died in 1907. He has two sons: William, the older, born in 1868, a man of intemperate and dissolute habits, who has been separated from his wife for some 20 years and after his mother's death is shown in a fragmentary way to have for much of the time made his home on the farm, living with his father when the latter was there, sometimes working on the place, and at one time renting it of his father for $75 a year and the taxes. His conduct and management of affairs, though tolerated and at times coöperated in by plaintiff, is indicated to have been a very disturbing element in the latter's life, of which he at times complained emphatically to others. Harley, the younger son and defendant herein, is 47 years of age, was married in 1896, lived near and worked his father's place for a time, is a temperate man of indicated good character and responsibility and a farmer living with his family near Cassopolis. Plaintiff himself had in former years been confessedly addicted to periods of excessive intemperance. He states that he used to drink heavily at times and get drunk, that he took the cure for it down at Warsaw, where he stayed three weeks, and says: "After I came back, I continued to drink heavily. They said they couldn't do anything for me because I was what they call a periodical drinker." He also stated that the last time he got drunk was in Constantine, and added, "I ain't touched anything for ten years." He, however, told in another part of his testimony of drinking beer at a saloon in Elkhart sometime subsequent to the death of his wife (in 1907) after which he states that he

went into the street and "got kind of tired out and I just sat down to the side of the street," when a nephew of his named Jim came along and called his attention to the fact that a policeman across the street was watching. His nephew, who then looked after him, tells a story of subsequent proceedings not altogether in harmony with plaintiff's and that he then claimed to have lost $300. Plaintiff admitted so stating and that he turned his watch over to his nephew, who later returned it, but asserted he did not lose "a cent." After the death of his wife he was afflicted with rheumatism which increased until he became a permanent cripple and unable to walk without crutches. After his wife's death he remained on his farm for a time, then lived with families in the neighborhood for three years or more and then returned to his former home which he attempted to maintain with the assistance of William who was with him at times and the services of women whom he employed at different times with William's aid, and who left for various reasons. His troubles in that particular were acute at times even as told by him with variations. He bought a piano to influence one to remain, who was of musical temperament and for a time impressed him favorably. Her efforts upon it proved too noisy to suit him. She did not remain long and left him with the piano on his hands, which he had worry and trouble in disposing of. The last woman he had was secured by William through something in the nature of a matrimonial advertisement which she answered, and it was arranged according to approved methods in such cases, as described by plaintiff:

"Willie went down, * * * they was to meet at the street car, and she was to dress one way and he another, so that they would know one another," etc.

This woman proved in her conduct and treatment of him so unsatisfactory to plaintiff that he ordered

her to leave, which she refused to do, threatening, as he states, "to sue me for a year's wages and for insulting her and that scared me, got me all unstrung."

For some time before a guardian was appointed troubles in his household and farm affairs so "unstrung" plaintiff, as he apparently realized, that he was wont to discuss them with and ask advice of those he knew, importuning various of his friends and neighbors to take charge of his property and affairs for him. At times when discussing his real or imaginary troubles he would break down and cry. He frequently appealed on such occasions to his son Harley, defendant, and at times offered to deed him his property, which Harley declined to accept, referring to his brother William and his daughter, telling his father she ought to eventually have her father's share. He, however, advised with and tried to smooth over his father's troubles and made him welcome at his home where the latter went from time to time and remained as long as he cared to, but he did not want to live there, preferring to be at or near his own place. The winter before a guardian was appointed he telephoned for defendant to come to his place where he said he had been six days alone with only crackers and water and a little grease to eat. Defendant then cared for and took him home with him as plaintiff admits, and states he remained there about six weeks when he "went back home."

His unstrung condition over his feared inability to discharge his last woman servant, with which trouble he went to defendant, led to their going together to the probate judge where he was apparently agreeable to the guardianship proceedings then instituted. A hearing was had and the order of appointment made, from which no appeal was taken. That adjudication is not open to attack. The claim made and issue tendered by his subsequent petition before that court, and for

review here, is that he has since recovered from his mental infirmities which then justified the order. It was not then, and is not now, claimed plaintiff was idiotic, imbecile or insane. Sanity or insanity was not the issue although somewhat stressed by plaintiff. In addition to the power to appoint guardians for those totally void of rational mentality, as the idiotic, imbecile and insane, the court has authority to appoint guardians for those persons "who by reason of old age or disease are mentally incompetent to have the care, custody and management of their estate," as it also has in certain cases of minors, those given to excessive drinking, etc.

A line of plaintiff's assignments of error is directed against rulings of the court in rejection or admission of what was in its nature opinion testimony of certain witnesses. On the whole, wide latitude was given in that particular to both sides. Numerous neighbors, relatives, friends and acquaintances of plaintiff of varying periods of time and degrees of intimacy testified, as also men of medical knowledge. Their testimony, elicited under lengthy direct and cross-examinations, constitutes a generous record which cannot be reviewed in detail. Early in the trial the court stated and for the most part adhered to the rule that non-expert witnesses could only express opinions on plaintiff's mental condition as supplemental to stating facts or incidents which indicated some basis for the conclusions expressed. To this might be added—or the testimony of the witness must clearly show that such intimate and close relations have existed between him and the party under inquiry as to fairly lead to and warrant the conclusion that such permitted opinion will be justified by the witness' occasion and opportunities for observation. *Paul* v. *Clements*, 176 Mich. 251. Of defendant's three witnesses, admission of whose testimony is assigned as error, one was a

grandson, a graduate of the Cassopolis high school and a school teacher, who had known his grandfather all his life, with familiar knowledge of his character-istics and conduct of his affairs as he grew older. He related incidents of eccentric talk and acts of plain-tiff in later years. Another was an old and near neighbor of 45 years' acquaintance with whom plain-tiff had discussed his troubles and asked to take charge of his property for him. He had a neighborly famili-arity with plaintiff and how he managed his affairs and told of incidents in that connection in recent years which impressed him as irrational and peculiar. The other witness, Dr. Planck, was plaintiff's long time family physician, had known him 30 years, had re-cently attended him when ill, met and talked with him often on the road, at his home and elsewhere. Since his wife's death plaintiff had frequently told his trou-bles to him and in doing so importuned the doctor to take charge of his property and business affairs for him. This witness expressed the opinion that plain-tiff was not mentally competent to have the care and management of his property. On cross-examination he answered that he had not said plaintiff was insane and did not so consider him. He, however, adhered to the opinion that he was mentally incompetent to care for and manage his property. In the course of his testimony he stated he came to that conclusion three years previous and then advised plaintiff he should have a guardian; that impressed by his various talks he tested him somewhat, saying:

"I proposed various schemes to him regarding his property, and some of them were very absurd, I think, as sort of feelers to see what his notions were, and he agreed with me. I could make him agree to any-thing, practically."

These witnesses were qualified to testify as they were permitted. Of those things in their testimony

which it is claimed militate against their opinions or the contradictory testimony of plaintiff's witnesses we are not concerned.. The weight of the testimony was for the jury. Any of plaintiff's witnesses who approximated this degree of long familiarity with and knowledge of plaintiff and his affairs were permitted to give their opinions as to his mental competency to have the care, custody and management of his estate. All were permitted to tell what they personally observed in his talk and conduct and those showing such acquaintance and knowledge as to reasonably judge were. allowed to state whether they detected anything unusual in his talk or actions indicating that he was mentally abnormal or incompetent.

Error is assigned on the refusal of the court to permit five witnesses, Stiles Carter, Anna Udell, Dr. George A. Hughes, Adelbert Field and Frank Jones, to express their opinions as to plaintiff's mental competency to have the care, custody and control of his estate in direct answer to the formal question. As to the first two witnesses, there is nothing in the record giving any force to such objection. While in the progress of Carter's examination the court made somewhat erratic rulings, he was eventually allowed to answer as follows:

"*Q.* In your opinion would you say that Milton A. Henderson is mentally competent to care for, have the management of his property and have the custody of it himself?

"*A.* Never discovered anything but what he was just as much so as ever, any more than he was growing old.

"*Q.* Then you would say that he was mentally competent?

"*A.* Yes, sir."

The witness, Udell; a school teacher, who formed plaintiff's acquaintance after September 4, 1917, and was favorably impressed with his discussion of the

civil war as well as the war then in progress, was permitted to answer all questions asked her without objection and apparently to volunteer any information upon the subject she desired. She was directly asked by plaintiff's counsel:

"*Q.* Based upon your observation and acquaintance with him, what would you say as to his mental condition, whether he is of sound mind or not; whether in your opinion he would be mentally competent to manage his own property and have the custody of it?" And answered without objection, "I think he is."

Dr. Hughes was employed professionally to examine plaintiff and did so in the office of his attorneys and elsewhere; and when he got through was told he would be called as a witness. He was asked for his opinion based on the examinations he had made at various times, his acquaintance and association with plaintiff and experience as a physician and surgeon. To this and another somewhat similar question counsel for defendant renewed his objection that it did not "appear to be an inquiry based upon his knowledge as an expert," which the court sustained "under the decision of *Matthews* v. *Lamberton* [198 Mich. 746]." This ruling unmodified would call for serious consideration, but in the course of his examination and after stating his observations witness was asked, and answered:

"*Q.* State from the examination that you have made of Milton A. Henderson, whether in your opinion as a physician and surgeon, Milton A. Henderson is competent to have the charge, care, management and custody of his person and property?
"*A.* I believe he is."

The last question with the answer, asked him by plaintiff's counsel, was:

"*Q.* You may state, from the examination you made of Milton A. Henderson, whether you noticed any-

thing that indicated to you that he was mentally incompetent—any fact or circumstance?

"*A. No, sir, I detected nothing.*"

Field, who, as a child, lived in the same neighborhood and knew plaintiff, stated, "but as I got older I moved away," to Union where he had lived for the past 30 years. He had met him occasionally since at the stores in Union, mostly during the past five years, and discussed the weather and roads with him, but a question as to his opinion of plaintiff's mental competency being objected to and sustained because sufficient facts were not stated, his counsel said:

"Well, you hesitated when you were asked whether or not you were well acquainted with Mr. Henderson, now I renew my question: You may state whether or not you are well acquainted with Milton A. Henderson?" To which witness replied, "I would say not."

"*Q. You would say you are not well acquainted with him?*

"*A. No.*"

The only further facts elicited from this witness were that plaintiff subpœnaed him, and that "In an early day he had observed his conduct when he saw him around where threshing was done," but for ten years or more knew nothing about farming matters "up there." The court held that he had not qualified by his answers to sufficient acquaintance with plaintiff and knowledge of his affairs to testify as to his mental competency in the particular matter under inquiry. We are not prepared to say this was an abuse of discretion, or otherwise erroneous.

Jones did not know plaintiff until sent to take him in an automobile to Conkright's in August, 1917, shortly before these proceedings were instituted. He stayed a couple of weeks at Conkright's where he at times played cards with plaintiff and visited with him. He was permitted to state that he did not notice anything in his conversation or conduct indicating he was

mentally incompetent. The conclusion of his examination by plaintiff's counsel, to which no previous objection was made, appears in the printed record as follows:

"*Q.* You may state whether or not, in your opinion, he is competent to have the care, management and custody of his person and property?
"*A.* I think he is.
"*Mr. C.:* I object to that.
"*The Court:* That may go it."

The witness was permitted to tell all the facts counsel could elicit and to state that he detected no indication of mental incompetency. We are not impressed with the seriousness of the court's ruling, whatever may have been intended—whether it should go in or out.

In this connection counsel for plaintiff complained that the court made "no distinction between the testimony necessary as a basis for opinions of insanity and sanity." As before stated, sanity and insanity were not the issue. This is made emphatic and instructively discussed at length, with reference to our own cases, in *Re Streiff,* 119 Wis. 566 (97 N. W. 189, 100 Am. St. Rep. 903). Even in *People* v. *Borgetto,* 99 Mich. 336, cited for plaintiff, a criminal case involving a conviction for murder in the first degree, where insanity appears to have been urged as a defense, this court in discussing the distinction and sustaining an answer that "He seemed to be all right to me," recognized a discretion in the trial court where such testimony is offered, based on "a sufficient acquaintance (with the party) under circumstances that give a reasonable opportunity for judging" as a preliminary to such answer. In this class of cases the single inquiry is directed to that degree of mental incompetency by reason of old age or disease, which disqualifies persons so afflicted, but not necessarily insane, from the normal care,

custody and management of their estates. In the instant case there was ample evidence of plaintiff's mental incompetency in that respect to carry the case to the jury, and after a careful reading of plaintiff's own testimony we cannot disagree with the view of the trial court that it tended to sustain rather than refute defendant's contention on that issue.

Plaintiff took the stand as a witness in his own behalf at the outset of the trial and again near the close. His testimony as it reads indicates a fluctuating memory, at times clouded comprehension and contradictions in both important and unimportant matters. As illustrative of the latter he at one time stated there were no proceedings in September looking towards appointing a guardian for him, at another time that he did not consent to have a guardian of his own free will, that defendant promised to resign in two years, made statements indicating he was under the impression that defendant had title to all his property and ought to deed it back to him; having told many things about his troubles with the women he employed, who he at one time asserted "was all good women" after he had related how the threatening conduct of one "scared" and "unstrung" him, when subsequently interrogated about it denied he was afraid and declared "Never was. You can't scare me;" he frequently emphasized his military service, about which his counsel interrogated him and elicited the following information:

"*Q*. During your service were you wounded?

"*A*. Well, it come pretty close. It made my hair white.

"*Q*. What?

"*A*. It turned all white. They used to call me 'Rabbit.' My hair turned white, but it is all turned white now. * * *

"*Q*. No bullet wound then?

"*A*. No. * * *

"*Q.* Well, you were near enough then to at least come close to a battle?

"*A.* Pretty near."

His appearance upon the stand and manner of testifying were necessarily before the jury and proper for their consideration in weighing the testimony and passing upon the facts. His age was undisputed and he was, or had been, afflicted with disease and its crippling results, if rheumatism is a disease. Those are the causes designated by the statute, and it was for the jury to determine from all the evidence before it whether the designated incompetency had resulted from such causes in this case. Pertinent to the fact that plaintiff was necessarily in a sense an exhibit in the case, plaintiff's counsel complain that the court prejudicially adverted to plaintiff's physical afflictions and in effect authorized the jury to decide the case on physical rather than mental incompetency, quoting the following excerpts from different parts of the charge, upon which error is assigned:

"Of course where the physical infirmity, you can readily see, acts upon the mental, why you would have a right to consider that. * * *

"It is necessary, to place him under guardianship, however, to find that because of extreme old age or from any other reason, or reasons, he is incompetent to have the charge and management of his property."

We think it sufficient to state that the first excerpt is a part of the following instruction:

"An adult should not be placed under guardianship or held under guardianship on the ground of mental incompetency unless he is, by reason of extreme old age or other causes, mentally incompetent to have the care and charge of his property. The fact that a man is lame or that it is difficult for him to get around to look after his business, standing alone, is no reason why he should be held under guardianship. It is not

206—Mich.—4.

the physical infirmity, necessarily, but it is that of the mental infirmity. Of course, where the physical infirmity, you can readily see, acts upon the mental, why you would have a right to consider that. Nor is old age, of itself, grounds for the appointment of a guardian. A person may go to a ripe old age and yet be in full possession of their mental faculties. The question is do the years that rest upon him, and have they in this particular case, so reduced his mental activity, that it is no longer susceptible of normal action? A person may even be incapable of conducting his business successfully, and still not be mentally incompetent."

The second excerpt is complained of because the word "incompetent" is used without qualification, which it is said would give the jury a right "to consider the rheumatism as an incompetency instead of the statutory condition, 'mentally incompetent.'" In the course of the charge, which is quite exhaustive on the subject, the court used the term "mentally incompetent" at least 19 times and defined it in various ways—once saying that the term "has been defined by the Supreme Court as follows:

"'It does not refer to persons who are sane, but not perhaps as wise or intelligent as some other persons. It applies to those whose mind is so affected as to have lost control of itself to such a degree as to deprive the person afflicted of sane and normal action.'" [*In re Storick*, 64 Mich. 685].

The excerpt complained of is the conclusion of a paragraph which defines "mental incompetency" and in which the term appears three times.

This case involves but one controlling issue of fact which the jury has decided with ample evidence to support their verdict, rendered after a thorough trial with both sides represented by able counsel, with an impartial and plain charge by the court instructing and cautioning the jury as to the principles which should guide them in passing upon the testimony and

determining the facts.  Defendant is friendly towards his father, has conserved his estate, gives him his pension each month as the probate court directs, has submitted the matter to the court and acts under its guidance, is not insistent on retaining the guardianship and stated:

"I would just as soon some one else would be guardian.  I have given father all the court said that I should.  So far as I am concerned I do not care how much of this he uses.  So it is used for him, that is all I care.  I have his money in the bank."

We discover no miscarriage of justice or reversible error in this judgment, which is therefore affirmed.

BIRD, C. J., and MOORE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.  OSTRANDER, J., did not sit.