*In re* JOHNSON'S ESTATE.

JOHNSON *v.* JOHNSON.

1. INSANE PERSONS—APPOINTMENT OF GUARDIAN—EVIDENCE.

A mere showing that an aged person is unwise, lacks judgment, indulges in folly, or squanders his property is not sufficient for the appointment of a guardian.

2. GUARDIAN AND WARD—APPOINTMENT—STATUTES.

The power of appointment of a guardian by the probate court is derived from statute and in order to obtain jurisdiction in such cases the statute must be strictly construed.

3. INSANE PERSONS—MENTAL INCOMPETENCY.

A mentally incompetent person is one who is so affected mentally as to be deprived of sane and normal action.

4. SAME—OLD AGE—WASTE—GUARDIAN.

To authorize appointment of a guardian of one enfeebled by age, his debility must be such that he cannot intelligently direct the management of his affairs, as a result of which his estate might suffer loss or waste.

5. SAME—INCAPACITY NECESSARY TO JUSTIFY APPOINTMENT OF A GUARDIAN.

Not every impairment of mind disqualifies one from the management of his property as unfitness to manage one's estate judiciously is insufficient but there must be such mental impairment as to render the subject incapable of understanding and acting with discretion in the ordinary affairs of life before appointment of a guardian may be justified.

6. GUARDIAN AND WARD—CIRCUIT COURT ORDERS REVIEWED BY CERTIORARI.

Review in the Supreme Court of orders of the circuit court in guardianship matters, is by appeal in the nature of certiorari.

7. CERTIORARI—SCOPE OF REVIEW.

Certiorari allows no review of decisions of fact and none of discretion unless there has been no such exercise of discretion as conforms to the rules of law applicable.

8. INSANE PERSONS—MENTAL COMPETENCY—QUESTION FOR TRIER OF THE FACTS.

In a proceeding to have a guardian appointed for a person claimed to be mentally incompetent it is for the probate judge, and if, on appeal, a jury is demanded, then for the jury to determine the fact of competency or incompetency.

9. SAME—DISCHARGE OF GUARDIAN—EVIDENCE OF WARD'S COMPETENCY—FINDING OF COURT.

In proceeding by ward to have his guardian discharged, finding of circuit court, sitting without a jury, that ward was mentally incompetent to have the burden, control and charge of his property *held*, supported by evidence, including the testimony presented by the ward himself.

10. SAME—MENTAL COMPETENCY—WILLS.

Fact that a ward was adjudicated mentally incompetent to have the care, control and custody of his property because of his age, does not necessarily imply that he would not be sufficiently competent to make a will.

11. SAME—WARD'S RIGHT TO HAVE ESTATE USED FOR HIS NEEDS AND DESIRES.

A ward who was adjudged mentally incompetent to have the care, control and custody of his property because of his age is entitled to have his property or income used in every reasonable way that will satisfy his needs and desires, short of guardian's wasting the estate in expenditures from which the ward could not reasonably be expected to have any enjoyment.

12. SAME — MENTAL INCOMPETENCY — USE OF ESTATE — PUBLIC CHARGE.

The guardian of a ward who had been adjudged mentally incompetent to have the care, control and custody of his property because of age should take no risk in making an expenditure that might result in petitioner's being made a public charge.

Appeal from Ottawa; Miles (Fred T.), J. Submitted June 8, 1938. (Docket No. 30, Calendar No. 40,076.) Decided October 5, 1938.

In the matter of the estate of Charles Johnson, a mental incompetent. On petition of Charles Johnson for discharge of guardian. Order denying petition to discharge. Petitioner appealed to circuit court. Affirmed. Petitioner appeals. Affirmed.

*Turner & Cochran,* for petitioner.

*Charles E. Misner,* for guardian.

McALLISTER, J. This is an appeal by Charles Johnson from an order of the circuit court denying his petition to discharge a guardian previously appointed for him by the probate court on the ground that he was mentally incompetent to have the care, management, control and charge of his property and estate.

On June 14, 1934, by order of the probate court, petitioner was declared to be mentally incompetent and on August 21, 1934, his son, the defendant, was appointed his guardian. On November 6, 1936, petitioner filed in the probate court an application to discharge the guardian which was denied February 26, 1937. Petitioner thereafter appealed to the circuit court and after a hearing, the circuit court on October 4, 1937, denied the petition.

Petitioner, now 80 years old, throughout a lifetime of hard work became the owner of considerable property, including five houses in Grand Haven and a large island, which has been divided into plots and is leased to various individuals for garden purposes. Up to the time of the appointment of his guardian, he appears to have managed his various properties in a careful and prudent manner. However, at the time of the order of the appointment, he was indebted in the amount of approximately $1,100. A large portion of this debt apparently resulted from

expenses of repair and upkeep of his property. He had previously purchased an automobile for $1,745 and had employed various young girls to drive the car for him. He paid them for these services and in one case rewarded one of the girls by purchasing a coat for her. In spite of the emphasis on this point by counsel for the guardian, no impropriety growing out of such relationship with these young women is suggested.

A year and a half prior to the proceedings in probate court, petitioner stated to his son that he had $3,600. There was no proof however that petitioner had in fact lost or squandered this amount of money, and from the evidence it appears that his remarks in this regard were merely in the nature of boastful statements.

Prior to the hearing in circuit court, the guardian was allowing petitioner $4 a week. The income of petitioner's estate is approximately $90 per month.

On the hearing in circuit court, Dr. Teifer, a duly licensed and practicing physician, member of the State Board of Medical Examiners, and president of the Muskegon County Medical Association, testified on behalf of petitioner. The witness, although specializing in general and orthopedic surgery and general practice, has had occasion to have experience with mental cases. He examined petitioner and gave as his opinion that petitioner had a clear conception of his property, the rentals due on the property, was normal and could carry on the business that would be required of him in taking care of his business and rents; that he seemed to have a very good memory, was able to use the processes of reasoning and appeared to have an intelligent comprehension of his business affairs. He conversed rationally on various subjects and in the opinion of Dr. Teifer was competent to manage his own affairs.

Dr. Eckerman, also a duly licensed physician from Muskegon, with an experience of 36 years in the practice of medicine, testified on behalf of petitioner. Dr. Eckerman had held the office of county physician for approximately 10 years and as such official had experience with mental cases. As part of his work during 10 years for the county, he was required to be one of the examining physicians in all mental cases before the probate court and examined between 15 and 30 mental cases a year. Dr. Eckerman had examined petitioner and tested his mentality in general conversation. It was the belief of this witness that petitioner could use his powers of reasoning, had a comprehensive sense of his property holdings; that his conversation was rational and that he seemed to have a good mental grasp of everything. He found nothing wrong with petitioner, satisfied himself on petitioner's faculty of memory, and, to the best of his knowledge and belief, based on a physical and mental examination, he believed petitioner perfectly competent.

The evidence as to the mental competency of petitioner, who lived in Grand Haven, was, however, contradictory. Although these two prominent physicians from Muskegon testified that in their opinions, from an examination of petitioner, he was competent to handle his affairs, two other physicians testified that, in their opinions, he was incompetent. One of these latter was a specialist in mental diseases, but much of his testimony bearing upon his opinion was apparently rejected by the circuit judge, and, because of unwarranted assumptions of unproved facts in such testimony, it is easy to see why the court was not impressed. The other medical witness for the guardian, Dr. DeWitt, was a resident of the town in which petitioner resided. He testified that he had examined petitioner prior to two previous hearings

in probate court in 1934, and 1936, in proceedings involving petitioner's mental competency. He gave as his opinion that petitioner was less mentally competent in 1936, than in 1934, when he was first adjudicated incompetent. Dr. DeWitt further testified that, in his opinion, petitioner was not mentally competent to have the care and management of his property. Unfortunately for its probative value, Dr. DeWitt's opinion did not reveal any very extensive factual basis. In answer to a question on cross-examination regarding the basis for his opinion, he stated that he derived it partly from petitioner's age and the hardening of his arteries, but on further inquiry stated that this was not the whole basis for his opinion. He was not pressed for a further explanation, when he agreed that he knew of nothing that would indicate that petitioner did not transact his business with study, prudence, and care.

There was testimony by one of the medical witnesses for the guardian that on the occasion of a mental examination, petitioner did not know the name of the governor of the State or the president; that he appeared to think President Wilson was still in office and had not heard of any of the national executives since that time. While he was able to do problems in arithmetic without pencil and paper, he failed on equally simple problems.

Since his adjudication as mentally incompetent, he married a woman 47 years old, being driven to South Bend, Indiana, for that purpose. Shortly before that time, he asked a young woman 24 years old to marry him. In his mental examination before one of the medical witnesses, he either did not know or did not recall what his wife's name was before he married her; he also stated that he had married her because the probate judge had told him he would be

a free man if he were married. Although on the trial he remembered his wife's last name and stated that he married her because he liked her, he, however, stated to one of the medical witnesses that he was not going to live with his wife after he got rid of the guardian.

Lay witnesses differed in their opinions as to petitioner's competency. Petitioner himself was a' witness. On some matters he revealed good memory and ability to follow processes of reasoning. At other times, he was vague, contradictory, unresponsive and meaningless in his answers, digressive, and garrulous.

There is nothing in the above facts, taken singly or in the aggregate, that can be said 'to be conclusive either as to the mental competency or incompetency of petitioner. Incongruities in his testimony and statements could result from ignorance, failure of memory or attention, difficulties of hearing, understanding and speaking English. His actions might be the result of mental incapacity or folly and lack of judgment. A mere showing, however, that an aged person is unwise, lacks judgment, indulges in folly, or squanders his property is not sufficient for the appointment of a guardian.

*In re Storick,* 64 Mich. 685, 690, it was said:

"Persons who can be safely trusted with taking care of themselves are seldom, if ever, liable to guardianship. * * * Neither is there any legal standard of business wisdom. Men may be unwisely speculative or unwisely penurious, but this is not insanity. * * * As long as he possesses a mind normally sound, he is entitled to free agency. It is as cruel and unlawful to interfere with the liberty of the old as of any one else; and the law cannot favor or permit this liberty to be diminished."

In *Partello* v. *Holton,* 79 Mich. 372, 378, it was said:

"*In re Brown's Estate,* 45 Mich. 326, the petition set forth that Brown was incompetent to have the care, charge, and management of his property, and that he was old and infirm. It was held that the statute contemplated the existence of insanity or of mental infirmity that is equivalent in destroying mental competency.

"The language of the Court in that case is applicable to this. There is no mental infirmity shown in the petition here, nor is it necessarily inferred from the allegations therein that the mental capacity of Holton is such that he is unable to manage his estate. It is rather to be inferred from the petition, taken as a whole, that from idleness or shiftlessness Holton is unable to support his family as he ought to, and that what he does earn he dissipates in foolish bargains or expenditures.

"The power of appointment of a guardian by the probate court is derived from the statute, and, in order to obtain jurisdiction in such cases, the statute must be strictly pursued. *North* v. *Joslin,* 59 Mich. 624, 646; *In re Bassett,* 68 Mich. 348; *In re Storick,* 64 Mich. 685. In the last case cited above we held that the statute (How. Stat. § 6314) does not refer to persons who are sane, but not, perhaps, as wise or intelligent as some other persons, but applies to those whose mind is so affected as to have lost control of itself to such a degree as to deprive the person afflicted of sane and normal action; and that the petition must either follow the statute, or use language and state facts fully equivalent, or the court will not obtain jurisdiction."

A mentally incompetent person is one who is so affected mentally as to be deprived of sane and normal action. A person may be incapable of conducting his business successfully and still not be men-

tally incompetent. *Henderson* v. *Henderson,* 206 Mich. 36. To authorize appointment of guardian of one enfeebled by age, his debility must be such that he cannot intelligently *direct* the management of his affairs, as a result of which his estate might suffer loss or waste. *McGuire* v. *Moorehead,* 151 Iowa, 25 (130 N. W. 140).

"Not every impairment of mind disqualifies one from the management of his property; unfitness to manage his estate judiciously is not sufficient. There must be such mental impairment as to render the subject incapable of understanding and acting with discretion in the ordinary affairs of life." 32 C. J. p. 630.

But petitioner, himself, was, in a sense, as has been remarked in a similar case, an exhibit in evidence, and the circuit judge in his opinion after taking the various facts into consideration, said:

"However, Mr. Charles Johnson was himself present in court and testified at length. Giving due consideration to his broken language; his faulty hearing, and the length of time consumed in his examination; still it appears that the extent of his property, its condition and its requirements are quite apparently a burden beyond what his mind appears to be able to carry."

Review in the Supreme Court of orders of the circuit court in guardianship matters, is by appeal in the nature of a writ of certiorari.

In *Goss* v. *Stone,* 63 Mich. 319, it was said:

"The ordinary proceeding to appoint a guardian is one for that sole purpose, and for the reasons pointed out in *Taff* v. *Hosmer,* 14 Mich. 249, which we need not repeat, the statute giving appeals without any express exceptions cannot be made subject

to exceptions on such an important matter as this. No authority is given for any appeal from the circuit court to this Court, and therefore we have no power to review the action of the circuit court, except in such way as is open on *certiorari,* which allows no review of decisions of fact, and none of matters of discretion, unless, perhaps, where there has been no such exercise of discretion as conforms to the rules of law applicable to such cases."

In the case of *In re Kellogg,* 196 Mich. 119, this court said with reference to review of probate proceedings in circuit court, where a jury had found petitioner mentally incompetent:

"This is an inquisition. It is for the probate judge, and if, on appeal, a jury is demanded, then it is for a jury to determine the fact of competency or incompetency. The probate judge found that Mr. Kellogg was mentally incompetent to take care of himself and manage his property, and in the circuit court a jury answered in the affirmative these two questions:

"Was Lafayette Kellogg on April 3, 1915, mentally incapable of taking care of himself and managing his property?

"Is Lafayette Kellogg now mentally incapable of taking care of himself and managing his property?

"If there was any testimony tending to support these findings of the jury, this court has nothing to do but remand the case.

" 'We can no more weigh the evidence in a case when a jury has determined the question than in a case where the court has determined it. We must not be understood as holding that, if there is no testimony showing mental incapacity, that question might not be reviewed in this court by writ of error from the circuit court; but in such case the court must have before it the entire testimony, from which it must conclusively appear that there was no evidence showing incapacity.' *In re Phillips,* 154 Mich. 139, 141.

"There was some testimony tending to prove mental incapacity of Mr. Kellogg—some besides that

which is referred to in the opinion of Mr. Justice
Bird. It is an undisputed fact that the property
which Kellogg sold for $3,000 was worth from $3,800
to $4,000. Dr. DeHaan testified, also, that Kellogg
had the typical apathetic face of senility.

"I think we are bound to say that there was some
testimony to support the conclusion reached in the
court below."

Because of the conflict of medical opinion and
testimony in this case, and in view of the fact that
petitioner himself was examined at great length, his
manner, appearance and bearing, his quality of mem-
ory and attention, as well as his answers to questions
propounded, raising inferences which could reason-
ably cause the court to conclude that he was men-
tally incompetent to have the burden, control and
charge of his property, we cannot say that the find-
ing and order of the circuit judge was not supported
by evidence.

The fact that petitioner was adjudicated mentally
incompetent to have the care, control and custody
of his property because of his age, does not neces-
sarily imply that he is not mentally competent in
other matters. He might be sufficiently competent
to make a will. *Rice* v. *Rice,* 50 Mich. 448; *Rice* v.
*Rice,* 53 Mich. 432; *In re Estate of Cummins,* 271
Mich. 215. And he cannot be held, because of such
an adjudication, to be, in effect, incompetent and in-
capable of enjoying the fruit of his labors. He is
entitled to have his property or income used in every
reasonable way that will satisfy his needs and de-
sires, short of the guardian's wasting such estate in
expenditures from which the ward could not reason-
ably be expected to have any enjoyment. It is need-
less to say that the guardian, even for the ward's
benefit or enjoyment, should take no risk in expendi-

ture that might result in petitioner's being made a public charge.

Upon a careful review of the entire record, the order of the circuit court is affirmed, with costs to defendant.

WIEST, C. J., and BUSHNELL, SHARPE, POTTER, CHANDLER, and NORTH, JJ., concurred. BUTZEL, J., took no part in this decision.