MACKEY v DEPARTMENT OF HUMAN SERVICES

Docket No. 288966. Submitted June 15, 2010, at Lansing. Decided September 7, 2010, at 9:05 a.m.

Elizabeth A. Marden submitted an application for Medicaid benefits to the Department of Human Services (DHS). The DHS found that Marden was eligible for Medicaid but applied a divestment penalty, refusing to pay for long-term-care services for 18 months and 23 days. The DHS applied the penalty as a result of Marden's investment of $111,460 in the Marden Family L.L.C. (the LLC). Marden's daughter and attorney-in-fact, Betsy Mackey, had formed the LLC approximately one month before Marden applied for Medicaid benefits. Mackey was assigned 100 investment units of the LLC and all 100 voting units. Marden was assigned 111,460 investment units of the LLC. As the sole voting member of the LLC, Mackey disallowed the transfer of investment units during a two-year holding period from the date of investment. After two years, investment units could be sold with a guaranteed compounded two percent interest rate on the amount paid for the units from the date of purchase to the date of sale. Marden appealed the DHS's decision to apply a divestment penalty. A hearing referee affirmed the application of the penalty, concluding that Marden had not received fair market value for her money. Marden then appealed in the Grand Traverse Circuit Court. The court, Philip E. Rodgers, Jr., J., reversed, concluding that the investment was not a divestment and that Marden had received fair market value for her money. The Court of Appeals granted the DHS's application for leave to appeal. Following Marden's subsequent death, the Court of Appeals substituted Mackey, her personal representative, as appellee.

The Court of Appeals *held*:

Federal law requires that a state determining Medicaid eligibility must look back a specific period to determine if the applicant made any asset transfers solely to become eligible for Medicaid. Under 42 USC 1396p(c), a Medicaid applicant eligible for long-term-care benefits is subject to a divestment penalty if he or she transferred a resource during the applicable look-back period for less than fair market value and the transfer was not otherwise

excluded as a divestment. To determine the fair market value of a resource, one must discern the value of the resource on the open market in an arm's-length transaction. Shell transactions between relatives that have little or no economic benefit to the applicant are not for fair market value. Marden's investment units in the LLC were not purchased on the open market in an arm's-length transaction. Therefore, the transaction did not reveal a fair market value. Given that the LLC was admittedly created to make Marden eligible for Medicaid, that Marden ceded total control over the investment to her daughter and fiduciary, and that Marden would receive only a marginal return on her unsecured investment after two years, the investment was not for fair market value. The investment was a divestment, and the DHS properly applied a divestment penalty. The trial court erred by ruling otherwise.

Reversed.

SOCIAL SERVICES — MEDICAID — DIVESTMENT OF RESOURCES — FAIR MARKET VALUE — ARM'S-LENGTH TRANSACTIONS — DIVESTMENT PENALTIES.

A Medicaid applicant eligible for long-term-care benefits is subject to a divestment penalty if he or she transferred a resource during the applicable look-back period for less than fair market value and the transfer was not otherwise excluded as a divestment; to determine the fair market value of a resource, one must discern the value of the resource on the open market in an arm's-length transaction; shell transactions between relatives that have little or no economic benefit to the applicant are not for fair market value (42 USC 1396p[c]).

*Rizzo & Associates, PLC* (by *John J. Rizzo III*), for petitioner.

*Michael A. Cox*, Attorney General, *B. Eric Restuccia*, Solicitor General, and *Jonathan S. Ludwig*, Assistant Attorney General, for respondent.

Before: MURRAY, P.J., and SAAD and M. J. KELLY, JJ.

MURRAY, P.J. Respondent, the Department of Human Services (DHS), appeals on leave granted the circuit court order reversing the hearing referee's decision that the DHS properly imposed a Medicaid benefit divest-

ment penalty on petitioner, Elizabeth Marden.[1] We conclude that the circuit court's ruling was in error because the circumstances of petitioner's investment in a closely held L.L.C. rendered the transaction a transfer for less than fair market value. Accordingly, the circuit court's order is reversed.

## I. FACTS AND PROCEEDINGS

The underlying facts are not in dispute. On November 29, 2005, petitioner and her husband applied for Medicaid, but they failed to disclose certain annuity contracts they held, which, had they been disclosed, would have rendered them ineligible for Medicaid benefits. On November 9, 2006, Mr. Marden died. Shortly thereafter, petitioner's case was due for redetermination, but was closed when she failed to return the required form.

On January 11, 2007, petitioner again applied for Medicaid, but was denied eligibility the following June because she had too much money in her bank account. After her second application had been denied, petitioner received close to $100,000 in payouts as a result of her husband's death. In preparation for submitting a third request for Medicaid benefits, petitioner's daughter and attorney-in-fact, Betsy Mackey, formed the Marden Family L.L.C. Mackey was assigned, in her own name, 100 investment (nonvoting) units of the L.L.C. and all 100 voting units. Petitioner was assigned 111,460 investment units, for which she (through Mackey's power of attorney) paid the L.L.C. $111,460. The same day, Mackey, as sole voting member of the L.L.C., acted to disallow any transfer of investment units during a

---

[1] Elizabeth Marden died April 23, 2009, and Betsy Mackey was substituted as the personal representative of Marden's estate. For clarity, Marden will be referred to as petitioner throughout this opinion.

two-year holding period. Thus, under the L.L.C.'s oper-
ating agreement, petitioner could not sell, transfer, or
liquidate her units for two years from the date of
investment without a supermajority of the voting mem-
bers. After two years, the agreement permitted sale of
the units and guaranteed compounding two percent
interest on the amount paid for the units from the date
of purchase to the date of sale. During the two years,
petitioner would not receive any payments from the
L.L.C.

That September, petitioner again applied for Medic-
aid, including a retroactive application for the month of
August (the month the L.L.C. was created). The DHS
found that petitioner was eligible for Medicaid, but
applied a divestment penalty,[2] refusing to pay for long-
term-care services for 18 months and 23 days. Peti-
tioner appealed the DHS determination, and the hear-
ing referee found that petitioner had not received fair
market value for her money, and affirmed the decision
of the DHS to apply the divestment penalty. Specifically,
the hearing referee found that because petitioner's
investment within the five-year "look-back" period ren-
dered an otherwise available cash asset unavailable for
two years, the investment was for less than fair market
value and a divestment penalty was appropriate. Addi-
tionally, the hearing referee rejected petitioner's argu-
ment that the investment was a permissible conversion

---

[2] A divestment penalty is computed by dividing the uncompensated
value of the resource divested ($111,432.47) by the average monthly
long-term-care costs in Michigan for the applicant's baseline date ($5,938
in 2007). Family Independence Agency, Program Eligibility Manual
(PEM) 405 (April 1, 2004), pp 8-9. The penalty would preclude petitioner
from receiving benefits for just over 18 months. Note that the DHS,
which produces the eligibility manual, was previously named the Family
Independence Agency. The DHS recently renamed the Program Eligibil-
ity Manual the Bridges Eligibility Manual.

of the annuity proceeds[3] since the annuity was actually cashed out—and was thus available as a cash asset— before it was invested in the L.L.C.

Petitioner then appealed to the circuit court, which reversed the hearing referee, holding that petitioner's purchase of the L.L.C. shares was not a divestment because she received fair market value for her money. In reaching this conclusion, the court initially observed that federal law permits certain annuity purchases and asset transfers for a spouse's benefit in order to circumvent countable asset provisions and qualify for Medicaid long-term-care benefits,[4] and noted that this was the third case wherein the DHS ruled that an applicant's investment in a closely held L.L.C. guaranteeing compound interest after a set period of time was a divestment.[5] As in the prior case it had decided, the court ruled that

> the purchase of stock in the family limited liability company in this case was not, by definition, a "divestment" because the transfer was not "for less than fair market value." In fact, the value of the asset did not change — the asset merely took another form — a form that legally made it unavailable and uncountable. Based on the authority cited herein, not only is the value of the stock not countable, but the income stream from that investment is also not countable.

---

[3] "Converting an asset from one form to another of equal value is **not** divestment even if the new asset is exempt. Most purchases are conversions." *Id.* at 7.

[4] The court cited § 6012(a) of the Deficit Reduction Act of 2005, PL 109-171, 120 Stat 4; 42 USC 1396p(c)(2)(B)(i); 42 USC 1396p(d)(2)(A)(ii); *Mertz v Houstoun*, 155 F Supp 2d 415, 426-427 (ED Pa, 2001); and *James v Richman*, 465 F Supp 2d 395 (MD Pa, 2006), aff'd 547 F3d 214 (CA 3, 2008).

[5] See *In re Gault*, unpublished opinion of the Grand Traverse Circuit Court, issued March 16, 2007 (File No. 06-25485-AA), and *In re Olsen*, unpublished opinion of the Manistee Circuit Court, issued June 6, 2007 (File No. 06-12519-AA). The DHS appealed neither case to this Court.

Accordingly, the court reversed the hearing referee's decision and determined that petitioner was entitled to long-term-care benefits without a divestment penalty.

We granted the DHS's application for leave to appeal, *Marden v Dep't of Human Servs*, unpublished order of the Court of Appeals, entered March 18, 2009 (Docket No. 288966), and now reverse.

## II. ANALYSIS

### A. GENERAL MEDICAID BACKGROUND

In 1965, Congress enacted Title XIX of the Social Security Act, commonly known as the Medicaid act. See 42 USC 1396 *et seq*. This statute created a cooperative program in which the federal government reimburses state governments for a portion of the costs to provide medical assistance to low-income individuals. *Cook v Dep't of Social Servs*, 225 Mich App 318, 320; 570 NW2d 684 (1997). Participation in Medicaid is essentially need-based, with states setting specific eligibility requirements in compliance with broad mandates imposed by federal statutes and regulations.[6] *Id.*; see also *Atkins v Rivera*, 477 US 154, 156-157; 106 S Ct 2456; 91 L Ed 2d 131 (1986), *Nat'l Bank of Detroit v Dep't of Social Servs*, 240 Mich App 348, 354-355; 614 NW2d 655 (2000), and *Gillmore v Illinois Dep't of Human Servs*, 218 Ill 2d 302, 305; 843 NE2d 336 (2006).

Like many federal programs, since its inception the cost of providing Medicaid benefits has continued to skyrocket. The act, with all of its complicated rules and regulations, has also become a legal quagmire that has resulted in the use of several "loopholes" taken advan-

---

[6] In Michigan, the Department of Community Health oversees the Medicaid program, which the DHS administers pursuant to the Social Welfare Act, MCL 400.1 *et seq*.

tage of by wealthier individuals to obtain government-paid long-term care they otherwise could afford. The Florida District Court of Appeal accurately described this situation, and Congress's attempt to curb such practices:

After the Medicaid program was enacted, a field of legal counseling arose involving asset protection for future disability. The practice of "Medicaid Estate Planning," whereby "individuals shelter or divest their assets to qualify for Medicaid without first depleting their life savings," is a legal practice that involves utilization of the complex rules of Medicaid eligibility, arguably comparable to the way one uses the Internal Revenue Code to his or her advantage in preparing taxes. *See generally* Kristin A. Reich, Note, *Long-Term Care Financing Crisis—Recent Federal and State Efforts to Deter Asset Transfers as a Means to Gain Medicaid Eligibility*, 74 N.D. L.Rev. 383 (1998). Serious concern then arose over the widespread divestiture of assets by mostly wealthy individuals so that those persons could become eligible for Medicaid benefits. *Id.*; *see also Rainey v. Guardianship of Mackey*, 773 So.2d 118 (Fla. 4th DCA 2000). As a result, Congress enacted several laws to discourage the transfer of assets for Medicaid qualification purposes. *See generally* Laura Herpers Zeman, *Estate Planning: Ethical Considerations of Using Medicaid to Plan for Long-Term Medical Care for the Elderly*, 13 Quinnipiac Prob. L.J. 187 (1988). Recent attempts by Congress imposed periods of ineligibility for certain Medicaid benefits where the applicant divested himself or herself of assets for less than fair market value. 42 U.S.C. § 1396p(c)(1)(A); 42 U.S.C. § 1396p(c)(1)(B)(i); Fla. Admin. Code R. 65A-1.712(3). More specifically, if a transfer of assets for less than fair market value is found within 36 months of an individual's application for Medicaid, the state must withhold payment for various long-term care services, i.e., payment for nursing home room and board, for a period of time referred to as the penalty period. Fla. Admin. Code R. 65A-1.712(3). Medicaid does not, however, prohibit eligibility altogether. It merely penalizes

the asset transfer for a certain period of time. *See generally* Omar N. Ahmad, *Medicaid Eligibility Rules for the Elderly Long-Term Care Applicant*, 20 J. Legal Med. 251 (1999). [*Thompson v Dep't of Children & Families*, 835 So 2d 357, 359-360 (Fla App, 2003).]

In *Gillmore* the Illinois Supreme Court recognized this same history, noting that over the years (and particularly in 1993), Congress enacted certain measures to prevent persons who were not actually "needy" from making themselves eligible for Medicaid:

In 1993, Congress sought to combat the rapidly increasing costs of Medicaid by enacting statutory provisions to ensure that persons who could pay for their own care did not receive assistance. Congress mandated that, in determining Medicaid eligibility, a state must "look-back" into a three- or five-year period, depending on the asset, before a person applied for assistance *to determine if the person made any transfers solely to become eligible for Medicaid.* See 42 U.S.C. § 1396p(c)(1)(B) (2000). If the person disposed of assets for less than fair market value during the look-back period, the person is ineligible for medical assistance for a statutory penalty period based on the value of the assets transferred. See 42 U.S.C. § 1396p(c)(1)(A) (2000). [*Gillmore*, 218 Ill 2d at 306 (emphasis added).]

See, also, *ES v Div of Med Assistance & Health Servs*, 412 NJ Super 340, 344; 990 A2d 701 (2010) (noting that the purpose of this close scrutiny while looking back is "to determine if [the asset transfers] were made for the sole purpose of Medicaid qualification").[7]

---

[7] Both the executive and legislative branches have supported elimination of any loopholes that allow individuals with resources to transfer assets as a way of qualifying for Medicaid benefits. For example, when signing into law the Deficit Reduction Act of 2005, PL 109-171, 120 Stat 4, President George W. Bush stated that the act " 'tightens the loopholes that allowed people to game the system by transferring assets to their children so they can qualify for Medicaid benefits.' " See Reif, *A Penny Saved Can Be A Penalty Earned: Nursing Homes, Medicaid Planning, The Deficit Reduction Act of 2005,*

This statutory look-back period, noted in *Gillmore* and *Thompson* and contained within 42 USC 1396p(c)(1), requires a state to look back a number of years (in this case five) from the date of an asset transfer to determine if the applicant made the transfer solely to become eligible for Medicaid, which can be established if the transfer was made for less than fair market value. See Family Independence Agency, Program Eligibility Manual (PEM) 405 (April 1, 2004), pp 1, 4; see also *Gillmore*, 218 Ill 2d at 306. "Less than fair market value means the compensation received in return for a resource was worth less than the fair market value of the resource." PEM 405, p 6.

A transfer for less than fair market value during the "look-back" period is referred to as a "divestment," and unless falling under one of several exclusions, subjects the applicant to a penalty period during which payment of long-term-care benefits is suspended. See, generally, PEM 405, pp 1, 4-9. "Congress's imposition of a penalty for the disposal of assets or income for less than fair market value during the look-back period is intended to maximize the resources for Medicaid for those truly in need." *ES*, 412 NJ Super at 344.

Turning to the case before us, then, the issue presented is this: whether the 93-year-old petitioner's investment of $111,460.47 in an L.L.C. formed by her daughter for the sole purpose of qualifying petitioner for Medicaid benefits constituted a divestment, and if so, is it otherwise excluded as a divestment.

### B. WAS THIS A DIVESTMENT?

"This Court reviews a decision of an administrative agency in the same limited manner as does the circuit

---

*And The Problem of Transferring Assets*, 34 NYU Rev L & Soc Change 339, 347 (2010) (citation omitted).

court." *Barker Bros Constr v Bureau of Safety & Regulation*, 212 Mich App 132, 141; 536 NW2d 845 (1995). Thus, our review

> is limited to determining whether the decision was contrary to law, was supported by competent, material, and substantial evidence on the whole record, was arbitrary or capricious, was clearly an abuse of discretion, or was otherwise affected by a substantial and material error of law. "Substantial" means evidence that a reasoning mind would accept as sufficient to support a conclusion. [*Dignan v Mich Pub Sch Employees Retirement Bd*, 253 Mich App 571, 576; 659 NW2d 629 (2002) (citations omitted); see also MCL 24.306.]

The substantial evidence standard is indistinguishable from the clearly erroneous standard of review. *Boyd v Civil Serv Comm*, 220 Mich App 226, 234; 559 NW2d 342 (1996). A finding is clearly erroneous when, "on review of the whole record, this Court is left with the definite and firm conviction that a mistake has been made." *Id.* at 235.

At the outset we recognize that in creating the L.L.C., petitioner made no pretense that the corporation's purpose was for any reason other than circumventing Medicaid rules that would otherwise render her ineligible for long-term-care benefits for a certain period. Such a purpose flies in the face of the *general* Congressional intent in creating the Medicaid program, i.e., to provide benefits to the truly needy, and of the 1993 amendments, i.e., to preclude asset transfers by those with wealth who would rather pass on their accumulated wealth and at the same time qualify for Medicaid without penalty. See *ES*, 412 NJ Super at 352; *Estate of Gonwa v Wisconsin Dep't of Health & Family Servs*, 265 Wis 2d 913, 934-935; 668 NW2d 122 (2003), citing *Cohen v Massachusetts Comm'r of Div of Med Assistance*, 423 Mass 399, 403-404; 668 NE2d 769 (1996);

*Gillmore*, 218 Ill 2d at 306. Petitioner admitted at oral argument before the trial court that the purpose in establishing the L.L.C. was to allow her to qualify for Medicaid without suffering a divestment penalty.[8] That admission, coupled with the timing of the share purchase and the particulars of the transaction, make it crystal clear that the only purpose of this asset transfer was to create eligibility for Medicaid.

As one court has noted, however, Medicaid contains loopholes permitting transfers that are inconsistent with the goals of that legislation, *Mertz v Houstoun*, 155 F Supp 2d 415, 427-428 (ED Pa, 2001), and our judicial duty is to enforce the purposes of the law *as expressed in the applicable statutory provisions*, *James v Richman*, 547 F3d 214, 219 (CA 3, 2008) (in interpreting 42 USC 1396, the court noted that "we do not create rules based on our own sense of the ultimate purpose of the law . . . but rather seek to implement the purpose of Congress as expressed in the text of the statutes it passed"), not to just enforce a generalized purpose or intent. We therefore turn to the actual statutory language and the PEM rules to determine the fate of petitioner's cause.

To be eligible for Medicaid long-term-care benefits in Michigan, an individual must meet a number of criteria, including having $2,000 or less in countable assets. Department of Human Services, Bridges Eligibility Manual 400 (January 1, 2010), pp 4-5; *Ronney v Dep't of Social Servs*, 210 Mich App 312, 315; 532 NW2d 910 (1995). As previously set forth, a Medicaid applicant eligible for long-term-care benefits is subject to a divestment penalty if she transfers a resource during the five-year look-back period for less than fair market

---

[8] At oral argument before the trial court petitioner admitted that the intent in creating the L.L.C. was to qualify her for Medicaid long-term-care benefits, but that her intent was not relevant.

value and that resource is not otherwise excluded as a divestment. 42 USC 1396p(c)(1); PEM 405, p 1.

With respect to fair market value, PEM 405, p 6, instructs that the phrase, "[l]ess than fair market value[,] means the compensation received in return for a resource was worth less than the fair market value of the resource" and elaborates that compensation must have "tangible form" and "instrinsic value." Neither the Medicaid act nor the PEM offers a definition of "fair market value." However, this Court has explained that the common understanding of "fair market value" is "the amount of money that a ready, willing, and able buyer would pay for the asset *on the open market* . . . ." *Wolfe-Haddad Estate v Oakland Co*, 272 Mich App 323, 325-326; 725 NW2d 80 (2006) (emphasis added). Black's Law Dictionary similarly defines "fair market value" as "[t]he price that a seller is willing to accept and a buyer is willing to pay *on the open market and in an arm's-length transaction*; the point at which supply and demand intersect." Black's Law Dictionary (7th ed), p 1549 (emphasis added). An "arm's-length" transaction, in turn, is defined as "relating to dealings between two parties who are not related . . . and who are presumed to have roughly equal bargaining power; not involving a confidential relationship[.]" *Id.* at 103.

Although no Michigan court has attempted to define the parameters of an arm's-length transaction, several courts in our sister states have indicated "that an arm['']s-length transaction is characterized by three elements: it is voluntary, i.e., without compulsion or duress; it generally takes place in an open market; and the parties act in their own self-interest." *Bison Twp v Perkins Co*, 2000 SD 38, ¶ 17; 607 NW2d 589, 593 (2000), citing *Walters v Knox Co Bd of Revision*, 47 Ohio St 3d 23, 25; 546 NE2d 932 (1989), and *Beach Prop, Inc*

*v Town of Ferrisburg*, 161 Vt 368, 375-376; 640 A2d 50 (1994). And, we have recognized that family members deal with each other in financial matters differently than they do "with strangers in arm[']s-length transactions . . . ." *Morrison v Secura Ins*, 286 Mich App 569, 574; 781 NW2d 151 (2009). Hence, to determine the fair market value of a resource, we must be able to discern what the value of that resource was on the open market.

While no Michigan case specifically addresses the issue before us today, other courts' treatments of asset transfers to circumvent countable asset requirements in similar contexts are instructive. For example, the Wisconsin Court of Appeals held that the purchase of a balloon annuity (an annuity where a substantial portion of the benefit is paid toward the end of the benefit term) from close relatives constituted a divestment because the transfer was for less than fair market value. *Buettner v Wisconsin Dep't of Health & Family Servs*, 2003 WI App 90, ¶¶ 1-2 and 18-19; 264 Wis 2d 700, 705-706, 716-717; 663 NW2d 282 (2003). In *Buettner*, the applicant and her spouse purchased two irrevocable balloon annuities from their children that "were nonassignable and unsecured, and were private financial instruments that paid a rate of return of less than one percent, with exceptionally low monthly income payments of fifty dollars per annuity." *Id.* at ¶ 19; 264 Wis 2d at 717. The court found that under those circumstances, an "arm's-length transaction" had not occurred because " '[n]o person of sound mind would give [$200,000] to an unrelated third party in exchange for the unsecured, low yield, and non-alienable promises in the instant document,' " and therefore the exchange constituted a transfer for less than fair market value. *Id.* at ¶¶ 19-20; 264 Wis 2d at 717-718 (alteration in *Buettner*) (citation omitted).

The Commonwealth Court of Pennsylvania decided two cases on the same day, *Pyle v Dep't of Pub Welfare*, 730 A2d 1046 (Pa Commw Ct, 1999), and *Ptashkin v Dep't of Pub Welfare*, 731 A2d 238 (Pa Commw Ct, 1999), that addressed Medicaid eligibility. In both of those cases, the court decided appeals from Pennsylvania Department of Public Welfare denials of applications for medical assistance benefits on the basis that available assets had been transferred for less than fair market value. In *Pyle*, the applicant transferred two large sums of money to a trust, the trustee of which was her daughter. In return for the lump sum payments, the applicant received from the trust a nonnegotiable promissory note that provided for a return of eight percent, plus an additional two percent premium in consideration of the fact that if Pyle died before the maturation date, the trust would have no further payment obligation. Both promissory notes required a minimal monthly payment followed by a balloon payment on the last month of the note's term. *Pyle*, 730 A2d at 1047-1048. In *Ptashkin*, the applicant's husband passed away, so the family home was sold. The applicant's two sons each executed a nonnegotiable promissory note payable to the applicant in exchange for the proceeds of the home sale. *Ptashkin*, 731 A2d at 239. These nonnegotiable promissory notes had the same eight percent and two percent interest rate provisions, with the payments being $17.18 per month with a balloon payment plus any accrued interest being payable at the maturity date of the note. *Id.* at 239-240.

In addressing these similar fact scenarios, the court utilized Pennsylvania's definition of fair market value, which is the " 'price which property could be expected to sell for on the open market or would have been expected to sell on the open market in the geographic area in which the property is located.' " *Ptashkin*, 731

A2d at 245, quoting 55 Pa Code 178.2. Focusing on the "open market" part of the definition similar to what we have in Michigan, in both cases the court concluded that the transactions involving the loan of large sums of money in exchange for low monthly payments followed by balloon payments were not fair market value transactions. Critical to the court's conclusion that both deals were "absurd" were the facts that the applicants were surrendering the principal without any security while receiving a monthly payment lower than what was required by the prescribed interest rates. *Ptashkin*, 731 A2d at 245; *Pyle*, 730 A2d at 1050. Indeed, the court noted that neither applicant was receiving any real benefit from the transaction other than to transfer large sums of money to relatives while avoiding paying for long-term care. *Ptashkin*, 731 A2d at 245; *Pyle*, 730 A2d at 1050.

Also analogous is the situation presented to the United States District Court in *Wesner v Velez*, unpublished opinion of the United States District Court for the District of New Jersey, issued April 19, 2010 (Docket No. 10-308). In that case, Wesner gave an $80,000 gift to her close friend and power of attorney, Aamland. That same month (December 2008) Wesner purchased a promissory note from Aamland for $60,000, with the payments going to Wesner to cover her nursing care for the 13 months before her request for Medicaid funds. The promissory note was not disclosed in her January 2009 application for benefits, but once the note was disclosed to the state, Wesner filed suit seeking to enjoin the state from treating the note as a prohibited trust-like device. In deciding Wesner's motion for a preliminary injunction, the court noted that the close relationship of the parties, coupled with the fiduciary duties to Wesner placed on Aamland through the power of attorney and the admission that the note was part of a

"Medicaid planning technique," showed that the transaction was likely a "sham":

> Wesner asserts that 42 U.S.C. § 1396p(c)(1)(I)(i)-(iii) was enacted by Congress to avoid "sham transactions." The transaction entered into by Wesner and Aamland appears to be a "sham transaction" designed to avoid application of the rules governing Medicaid eligibility. The loan between Wesner and Aamland has all the characteristics of a trust-like device under the POMS.[9] This was not an arm[']s-length transaction between two unrelated parties. Aamland and Wesner apparently enjoy a close friendship; Wesner gave Aamland an $80,000.00 uncompensated gift and has made Aamland her [power of attorney]. As such, Aamland owes Wesner a fiduciary duty. Further, Wesner admits that the gift/loan transaction entered into with Aamland was part of a "Medicaid planning technique." Based a [sic] review of the evidence before the Court at this time, the Court concludes that Wesner has failed to establish that she is likely to succeed on the merits of her claim; therefore, Wesner's motion for a preliminary injunction is denied. [*Wesner*, unpub op at 10-11 (citation omitted).]

Turning to the case before us, we recognize that the potential return on the sale of petitioner's interest would exceed the amount of her original investment after two years.[10] Additionally, not only does the DHS make no claim impugning the formation or legitimacy of the L.L.C. as an entity under Michigan law, see MCL 450.4201, but also, as petitioner makes clear, the

---

[9] "The Social Security Administration has published a Program Operating Manual System (POMS) representing the publicly available operating instructions for processing Social Security claims. While not the product of formal rulemaking, the POMS provide guidance to the courts and warrant respect." *Wesner*, unpub op at 6 (quotation marks and citations omitted).

[10] Petitioner calculated the return on the sale of her investment to be $113,922.98, or a profit of $2,490.51.

L.L.C.'s terms of investment are consistent with relevant IRS and SEC regulations.[11]

While the DHS contests the transfer on the grounds that the two-year waiting period, alone, rendered the transaction for less than fair market value, we are hard pressed to reach that conclusion where the investment would *increase* in value over the two-year restriction period. However, that petitioner would not realize this value for two years is a relevant factor to consider, it is just not alone dispositive of this issue. In so concluding, and for the reasons detailed below, we agree with the DHS that the circuit court erred in reversing the hearing referee, as under these unique facts the purchase of the L.L.C. shares was for less than fair market value.

Utilizing the foregoing dictionary definitions and caselaw, we hold that petitioner's purchase of shares in an L.L.C. (1) that is unsecured, (2) operated exclusively by her daughter (and her attorney-in-fact), (3) that is not an approved investment vehicle under PEM 405, (4) whose shares are unavailable in the open market and are nonassignable, (5) where there is no evidence of actuarial soundness, (6) where no monthly distributions are made to petitioner during the two-year period, and (7) was purchased to make petitioner eligible for Medicaid, was not the result of an "arm's-length" transaction made on the open market. Consequently, it was a purchase for less than fair market value, and therefore the assets are subject to the divestment penalty.[12]

---

[11] Specifically, petitioner points to 17 CFR 230.144(d) and IRS Revenue Ruling 59-60, § 8.

[12] Petitioner's reliance on the ruling of the United States Court of Appeals for the Third Circuit in *James* is unavailing as the central issue in that case was "whether a non-revocable, non-transferable annuity may

Indeed, these circumstances reveal that this transaction was an impermissibly abusive attempt to shelter assets. *Gillmore*, 218 Ill 2d at 324-325; see also *Thompson*, 835 So 2d at 359-360. The evidence reveals an unsecured private transaction between relatives, one of whom was the other's fiduciary, wherein a purchase of shares was made without any ability to sell or otherwise exchange the shares for a two-year period. The L.L.C. was operated exclusively by an individual who was both a close relative and fiduciary, and the L.L.C. had no real business other than to return petitioner's investment, plus two percent compounded interest, at the end of two years.[13] Additionally, and unlike the balloon annuity found deficient in *Gillmore*, the purchase of shares in the L.L.C. did not result in any monthly payments to petitioner. See *Pyle*, 730 A2d at 1050. And, we must also consider the admitted purpose in creating the L.L.C. (to make petitioner eligible for Medicaid payments without divestment) in conjunction with the fact that petitioner's daughter (who was also an attorney-in-fact for petitioner) created the L.L.C. and controlled 100 percent of the voting shares, including having unfettered discretion on expenditures of reserve funds.

In sum, taken together these facts point to the inescapable conclusion that this was not an asset that was purchased on the open market, but instead was an arrangement between relatives, not strangers in an

be treated as an available resource by the [Pennsylvania Department of Public Welfare] for the purposes of calculating Medicaid eligibility." *James*, 547 F3d at 218. In contrast, the DHS in this case found petitioner eligible despite the transaction, but instead sought to delay the payment of benefits pending the divestment penalty period.

[13] Interestingly, the records for the Marden Family L.L.C. bank account reveal that a four percent interest rate was applied to deposited monies, highlighting the fact that the two percent rate awarded by the L.L.C. was lower than what was available on the open market.

arm's-length transaction. Thus, the compensation petitioner was ultimately to receive "was worth less than the fair market value of the resource" because nothing about this transaction revealed a fair market value, i.e., it was not made through an arm's length transaction on the open market. Accordingly, the DHS properly concluded that this particular transaction was for less than fair market value, and was subject to the divestment penalty.[14]

In making her arguments, petitioner fails to recognize, or at least appreciate, the private, non-arm's-length relationship involved in the transaction. The definitions and caselaw recited clearly indicate that shell transactions between relatives that have little or no economic benefit to the applicant, are not for fair market value. This point was made by the court in *Mertz*, a case relied upon by the trial court. There, the applicant's spouse had purchased two *commercial* annuities with $106,000 of joint assets, receiving in return just under $2,000 a month, or a $2\frac{1}{2}$ percent return. In recognizing that the purchases at issue were inconsistent with the purposes of Medicaid, but not the language of the act, the court noted that private, unsecured, nonassignable transactions between relatives—like those involved in *Pyle* and *Ptashkin*—were on much different footing. *Mertz*, 155 F Supp 2d at 427-428 n 16. Likewise, petitioner's analogy to United States savings bonds misses the point, because purchasing unsecured shares in a private L.L.C. operated by a relative bears little, if any, resemblance to a purchase of savings bonds on the open market from the United States government.

Nor was the asset transfer in this case otherwise excluded as a divestment under the PEM. See PEM 405,

---

[14] This is not to say, however, that investment in an L.L.C. or even a closely held corporation would be a per se divestment, but only that the scheme at issue in this case constitutes a transfer for less than fair market value.

pp 6-9. While PEM 405 certainly provides numerous categories of transfers that are excluded from consideration as a divestment, PEM 405 provides no exclusion category for an asset transfer for an interest in a closely held limited liability corporation, as is the case here. Consequently, the trial court's ruling that the investment was essentially a conversion of the asset into a form rendering the asset unavailable and uncountable was incorrect.[15] Key to the definition of an asset conversion on this point is that the conversion must be "from one form to another of *equal value*." See PEM 405, p 7 (emphasis supplied). The examples provided in PEM 405 are purchases of automobiles or boats, where the applicant buys an asset on the open market and obtains the asset, presumably at market price. As previously concluded, however, given the circumstances of this transaction it was not established that what petitioner received for her assets was for fair market value, and so by definition could not be considered a conversion to a form of equal value. Indeed, to hold to the contrary would enable the exception to swallow the rule.

### III. CONCLUSION

Petitioner invested a sizeable sum in the Marden Family L.L.C., which was created solely for the purpose of circumventing Medicaid eligibility requirements and

---

[15] Whether petitioner's investment was unavailable and uncountable on account of the transfer does not impact whether the transfer is a divestment, but rather goes to the initial determination of whether an applicant is eligible for Medicaid benefits. *ES*, 412 NJ Super at 348 (stating that "[i]f any of the applicant's resources are transferred for less than fair market value during the look-back period, they are included in the eligibility analysis as funds available to the applicant," and result in delayed eligibility and imposition of a transfer penalty); see also 42 USC 1396p(c)(1)(A).

which ceded total control to petitioner's daughter (and fiduciary) for a fraction of the cost of petitioner's investment. Under the terms of the agreement, petitioner would only receive a marginal return on her unsecured investment after two years. A willing buyer could not acquire such an asset on the open market in an arm's-length transaction. Therefore, the transaction was for less than fair market value and constituted a divestment of assets not subject to an exclusion. The hearing referee's conclusion affirming the imposition of a divestment penalty by the DHS was appropriate, albeit for the wrong reason. *Thorin v Bloomfield Hills Sch Dist*, 179 Mich App 1, 6; 445 NW2d 448 (1989) ("The familiar rule that appellate courts affirm the right result reached for the wrong reason is appropriate in the administrative context."). The circuit court erred in ruling otherwise.

Reversed.

No costs, a public question being involved.