*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ESTATE OF RONALD J. SONS, by DAVID
WILLIAM SONS, Personal Representative,

UNPUBLISHED
November 14, 2019

Plaintiff-Appellant,

v

No. 346979
Van Buren Circuit Court
LC No. 2017-067664-DO

MARY BETH SONS,

Defendant-Appellee.

Before: MURRAY, C.J., and MARKEY and BECKERING, JJ.

PER CURIAM.

In this appeal from a judgment of divorce (JOD) that dissolved the marriage of Ronald J. Sons and defendant, Mary Beth Sons, plaintiff, the Estate of Ronald J. Sons,[1] challenges the trial court's division of marital property. Specifically, plaintiff argues that the trial court's award to defendant of homes in Michigan and Florida was inequitable. We affirm.

## I. RELEVANT FACTS AND PROCEEDINGS

The couple married on June 22, 2012. At the time, both knew that Mr. Sons was suffering from stage IV cancer. Defendant's premarital assets from a prior divorce included a Chevron Employee's Savings and Investment plan valued at $650,000, a BP retirement accumulation plan that paid $64 monthly, an insurance policy with a face value of $50,000, and monthly maintenance payments of approximately $1,330 for three years. In addition, defendant

---

[1] Less than a month after entry of the JOD, and shortly after filing his claim of appeal, plaintiff, who had been suffering from stage IV cancer, died. Subsequently, this Court granted a motion to substitute the Estate of Ronald J. Sons, by personal representative David William Sons, as plaintiff-appellant. *Ronald Sons v Mary Beth Sons*, unpublished order of the Court of Appeals, entered May 21, 2019 (Docket No. 346979). We use "Mr. Sons" to refer to the original plaintiff in this case, and "plaintiff" to refer to the plaintiff-appellant estate.

also had approximately $73,000 in the bank, an IRA of approximately $24,000, and $1,700 in retirement income from the Catholic school where she had taught. Mr. Sons's premarital assets were $1,978 a month from social security, a monthly pension of $1,053.97 from the Chicago Tile Institute, a monthly pension of $649 from the Bricklayers Union, $25,000 in a bank account, and a fixer upper house on Water Street in Paw Paw, Michigan.

Mr. Sons filed a complaint for divorce on November 6, 2017. He testified at the subsequent bench trial that he received income of $461,000 during the course of the marriage and spent $397,000 on purely marital expenses.[2] In support of this assertion, he offered into evidence excel spreadsheets that he and his brother, David, created. Defendant's attorney objected to the admissibility of the spreadsheets on grounds that Mr. Sons had not disclosed all of the spreadsheets during discovery, and had not provided the bank statements that were the purported basis of the spreadsheets, instead disclosing only "screen shots" of partial documentation covering only three years. The trial court ultimately ruled that the spreadsheets were inadmissible, but said that it would rely on testimony based on the spreadsheets and on its own notes.

Defendant admitted into evidence three years' of bank statements from her real estate business[3] to show the amount of money transferred from her business into either Mr. Sons's personal account, from which defendant could not write checks, or into the couples' joint account. Defendant testified that the statements showed that from 2015 through 2017, she transferred $34,750 into Mr. Sons's personal account and a net of $215,990 into their joint account. Defendant said that some of the transfers into Mr. Sons's account were for things he wanted to buy when he felt good, such as a boat, a dinghy, a jet ski, and a rowboat, all of which, defendant learned through discovery, Mr. Sons had titled in his name alone. Defendant explained that when they first married, "it was understood that what was his was his and what was mine was mine." However, as time went on, Mr. Sons increasingly devoted his income to his medical treatment, while defendant took on more of the couples' financial obligations, until, by 2016, she was paying for everything except the car insurance and the boat insurance.

Defendant and Mr. Sons agreed that defendant withdrew $200,000 from her premarital retirement account[4] to purchase property from Mr. Sons's nephew in 2012. The property consisted of a small lakefront lot with a house and a lot across the street with a pole barn. Defendant paid $170,000 for the lakefront property and $30,000 for the lot and pole barn.

---

[2] According to calculations done at trial, Mr. Sons earned approximately $360,696 during the 66-month marriage. When defendant's counsel pointed out the difference to him, Mr. Sons stated that he also had some minor side jobs and over $10,000 in donations for cancer care. In the end, Mr. Sons could not explain where the $461,000 figure came from and stated that the $100,000 discrepancy was "not much difference."

[3] Defendant obtained her real estate license in 2013 and subsequently ran a successful real estate business.

[4] Presumably, the reference is to the Chevron Employee's Savings and Investment plan defendant obtained in her prior divorce.

Defendant explained that she was not a realtor at the time, did not know anything about buying houses, did not work with a realtor to purchase the property, and did not have it appraised before purchasing it. She said that Mr. Sons's nephew told her someone had made a $170,000 offer on it, and that Mr. Sons told her it was a good deal and purchasing it would help his family. She said she had been naïve and indicated that she felt pressured to buy the property. In addition to the property's purchase price, defendant also paid $60,000 in taxes and early retirement-plan withdrawal fees.

Defendant initially titled the Michigan property in her name and put it in her living trust. In January 2014, however, she quitclaimed the property from herself as grantor to herself and Mr. Sons as husband and wife with rights of survivorship. Mr. Sons testified that defendant took this step in exchange for his agreement to help with the bills. However, defendant said she did it because Mr. Sons "was becoming increasingly agitated," often telling her that if she died in a car accident, her family would kick him out of the house and he would have nowhere to live, and saying that if she loved him, she would put him on the title.[5]

Mr. Sons and defendant testified to the amount of work they put into the Michigan house, and defendant testified to the amount of work yet to be done. Mr. Sons said that he put on new roofing, put in two closets, made a basement walkout with a patio, regraded the yard and re-planted grass. He could not remember who paid for the materials and labor to make these improvements. Defendant testified that, at the time of trial, the well needed replacing because it was not deep enough, was too close to the house, and was discharging rust particles. The electrical wiring needed to be re-done, the ceiling fan was about to fall off the dining room ceiling, all of the windows leaked, the roof leaked when the wind was from a certain direction, and the back porch was not "legal" because it was built without a permit. In addition, the pole barn's roof leaked and the overhead door did not work.

An April 2018 appraisal of the property came in at $135,000. Mr. Sons disputed this value through his witness, Daniel Leonard, a state-certified appraiser and associate broker for a real estate company. Leonard testified, based on his drive-by inspection of the property and his review of aerial images, sales records, a 2015 appraisal, and the 2018 appraisal, that he saw no reason why the property should decline in value from $170,000 to $135,000. Leonard opined that some of the older, purportedly comparable properties used to arrive at a value for the subject property were stale. He admitted, however, that he did not enter the home or the pole barn, did not know the interior condition of either, and did not do an appraisal. Dan Northrup, the appraiser responsible for the April 2018 appraisal, explained the reasoning behind his choice of

---

[5] The record evidence suggests that Mr. Sons may have sought title on the real estate because title determined ownership under the parties' prenuptial agreement. Defendant's testimony that Mr. Sons titled all the vehicles and watercraft purchased in his name only was undisputed. In addition, defendant admitted into evidence a text message Mr. Sons sent her shortly after he filed for divorce. In the message, he apparently indicated that there were only three pieces of property in joint ownership, that he would have to give defendant a "wad of cash," and that he would have divorced her as soon as she signed over the lake house to him.

comparables and each adjustment he made to the comparables and stood by his appraisal of $135,000. The court admitted Northrup's appraisal report without objection; it was the only appraisal submitted to the trial court.

According to defendant, Mr. Sons was the driving force behind obtaining the couple's Florida house, a foreclosure in Englewood located near Mr. Sons's brother. Unable to obtain a mortgage on his own because of a 2010 foreclosure and bankruptcy, Mr. Sons asked defendant to help, and she did. In order to purchase and renovate the Florida home, defendant took out a $107,000 mortgage on the Michigan house and a $31,000 home equity line of credit. Defendant testified that she transferred $7,700 from her business account to the joint account to pay the earnest money. In addition, because the mortgage had not come through by the time they had to close on the Florida house, defendant withdrew the remaining balance due from her retirement account. She used the mortgage money to replace the amount she had withdrawn from her retirement account, thereby avoiding penalties, to pay off credit cards and the Jeep driven by Mr. Sons so that her credit-to-debt ratio would be acceptable to the financial institution, and to help with remodeling the Michigan and the Florida houses. Defendant testified to her belief that she funded a greater share of the improvements to the Florida house, based on what she transferred to the joint account and Mr. Sons's charges on the credit cards, which she paid, but she said it was work that needed to be done and she "just wanted to make him happy." Both agreed that defendant was solely liable for repaying the mortgage and home equity loan. Mr. Sons did not remember the exact timing of events related to the purchase, did not remember anything about defendant having to pay off credit cards, and insinuated that defendant somehow benefitted from the money in excess of the house's purchase price. He and defendant stipulated to $129,000 as the value of the Florida house.

Mr. Sons accused defendant of having affairs with two men and asserted that her infidelities were the reason he filed for divorce, but presented no evidence to substantiate his accusations. Defendant called two witnesses who were present at an event where Mr. Sons insisted that he saw defendant and a certain man "making out like the Russians were dropping bombs on us[,]" and both testified that Mr. Sons's allegations were completely unfounded. In addition, defendant testified that after she received the divorce papers, she discovered that Mr. Sons had installed a surveillance camera in her home that allowed him to see and hear everything she was doing.[6]

After hearing the proofs and considering written closing arguments, the trial court entered a decision on October 25, 2018. After acknowledging the prenuptial agreement with attached schedules of premarital assets, the trial court found that the marriage had lasted approximately five years and five months, that defendant contributed 60% or more of the income for joint expenses during the marriage, while Mr. Sons contributed 40% or less, and that the facts did not support Mr. Sons's allegations of infidelity. The court also found that Mr. Sons would need a residence, transportation, and continuing medical treatment until his death, and lacked the ability

---

[6] Police came out, removed the camera, and checked her home for other bugs; she declined to press charges.

to earn money beyond his pensions and social security, while defendant did not have any special needs and could continue to build her real estate business. Finally, the court stated that it would base its division of the assets on what assets the parties brought into the marriage, the income they provided to the marriage, their relationship during the marriage, and their needs at the time of the divorce.

Based on these findings, and relevant to the issue on appeal, the trial court awarded the Michigan house and its debt to defendant. Recounting the testimony regarding purchase of the Florida house, and noting the $129,000 stipulated value of the house, the court concluded that there was no true equity in the Florida house, as the mortgage and home equity loan taken out on the Michigan property to purchase the Florida house approximated the value of the Florida house. In light of defendant's liability on the mortgage and loan, the trial court awarded the Florida house to defendant, subject to Mr. Sons's life estate. The court entered a corresponding JOD on December 21, 2018.

## II. DISCUSSION

Plaintiff first contends that the trial court committed clear error by accepting $135,000 as the appraisal value of the Michigan property, without considering the property's $200,000 purchase price. We disagree.

When reviewing dispositional rulings, we first review the trial court's findings of fact, *Sparks v Sparks*, 440 Mich 141, 151; 485 NW2d 893 (1992), and will not reverse them unless they are clearly erroneous, *Hodge v Parks*, 303 Mich App 552, 555; 844 NW2d 189 (2014). "Findings of fact are clearly erroneous when this Court is left with the definite and firm conviction that a mistake has been made." *Id*. (quotation marks and citation omitted). We afford special deference "to a trial court's factual findings that are based on witness credibility." *Id*.

Contrary to plaintiff's representations, the record shows that the trial court did consider the purchase price of the property and concluded that Northrup's April 2018 appraisal was a fair one "as there are many problems with the home according to the testimony." In addition, defendant's undisputed trial testimony was that Northrup's valuation was consistent with the 2015 appraisal of the property completed for purposes of obtaining a mortgage to pay for the Florida house. Defendant testified that the initial 2015 appraisal was in the low 120s, and that "[t]hat amount went by five times until we got the amount Ron [Mr. Sons] wanted." This statement certainly implies that Mr. Sons was well aware of the value of the property. Defendant further testified that after she and Mr. Sons made some improvements, the appraisal still rose to only $135,000 or $139,000.

Plaintiff implies that the trial court should have used $200,000 as the fair market value of the property because that is what defendant paid for it. Fair market value is " '[t]he price that a seller is willing to accept and a buyer is willing to pay *on the open market and in an arm's-length transaction*; the point at which supply and demand intersect.' " *Mackey v Dep't of Human Servs*, 289 Mich App 688, 699; 808 NW2d 484 (2010), quoting *Black's Law Dictionary* (7th ed), p 1549 (emphasis added in *Mackey*). "An 'arm's-length' transaction, in turn, is defined as 'relating to dealings between two parties who are not related . . . and who are presumed to have roughly equal bargaining power; not involving a confidential relationship[.]' " *Id*., quoting

*Black's Law Dictionary* (7th ed), p 103. The hallmarks of an arm's-length transaction are that "it is voluntary, i.e., without compulsion or duress; it generally takes place in an open market; and the parties act in their own self-interest." See *Mackey* 289 Mich App at 699 (quotation marks and citations omitted). In addition, this Court has "recognized that family members deal with each other in financial matters differently than they do with strangers in arm's-length transactions." *Id*. at 700 (quotation marks, ellipsis, brackets, and citation omitted).

Here, defendant testified that she felt pressured by Mr. Sons to purchase the house from his nephew and that she did not work with a realtor or have the property appraised prior to purchasing it. Further, the sale appears to have been a private affair, not something that occurred on the open market. Thus, the circumstances surrounding defendant's purchase of the property do not support the assumption that the purchase price of $200,000 was the property's fair market value.

In sum, Northrup's was the only appraisal submitted to the trial court and it was in line with the property's 2015 appraisal. Although Leonard questioned the appraisal, he did not inspect the interior of the house or the pole barn, and appeared to assume, incorrectly, that $170,000 was the fair market value of the house. In light of these facts, the trial court's acceptance of $135,000 as the value of the Michigan property does not leave us with "the definite and firm conviction that a mistake has been made." *Hodge*, 303 Mich App at 555. Accordingly, the trial court's finding of fact that the value of the Michigan property is $135,000 is not clearly erroneous.

Plaintiff also argues that the trial court's distribution of assets was inequitable, and that, at the very least, the trial court should have awarded him $98,500 as his share of the equity in the two houses.[7] Plaintiff contends that awarding him half the equity in the two properties would represent a congruent division of the property, especially since the court did not award plaintiff spousal support or attorney fees and awarded only a "nominal sum" for plaintiff's contribution to defendant's business. In addition, plaintiff reiterates that Mr. Sons earned $461,000 during the marriage, almost all of which he spent on marital expenses, and that the division of property left him "with virtually nothing." Plaintiff's arguments are without merit. We "review[] whether a trial court's dispositional rulings are fair and equitable in light of the trial court's findings of fact," and will reverse "only if definitely and firmly convinced that the disposition is inequitable." *Hodge*, 303 Mich App at 555.

The circumstances surrounding acquisition of the Michigan property and the Florida property support a conclusion that the trial court's award of both properties to defendant was equitable under the circumstances. Not only did defendant overpay for the Michigan property to begin with, but she also had to pay another $60,000 for taxes and early withdrawal fees when obtaining the money for the purchase price from her retirement account. It is undisputed that plaintiff did not contribute toward this liability. Defendant also took out a mortgage and home equity line of credit on the Michigan property to use to purchase the Florida house. Defendant is

---

[7] Plaintiff bases its calculation of equity on the $200,000 value for the Michigan property that the trial court properly rejected.

solely liable for this debt. Thus, in large part due to Mr. Sons's persistence, defendant may end up paying in excess of $400,000 ($200,000 purchase price, plus $60,000 for taxes and early withdrawal fees from her retirement account, plus $138,000 for the mortgage and home equity loan) on a property fairly valued at only $135,000 and still in need of considerable repair. In addition, the trial court did not split the value of the vehicles and watercraft awarded to each party, because it reasoned that Mr. Sons did not have the money to pay defendant her share, and because defendant wanted Mr. Sons to live out his days as happily as he could.

In dividing property, the court may also consider factors such as the contributions of the parties to the marital estate and the fault or past misconduct of the parties. See *Sparks*, 440 Mich at 159-160. Here, the trial court found that defendant contributed 60% or more to the joint account, while Mr. Sons contributed 40% or less, and implied that defendant also made substantial emotional contributions to the marriage enterprise. Regarding the latter, the trial court observed that Mr. Sons's stated reason for filing for divorce, defendant's alleged infidelities, was not supported by fact, and that defendant would strongly consider reconciling with Mr. Sons and living as husband and wife, while Mr. Sons showed no such interest. In addition, the record shows that Mr. Sons blindsided defendant by filing a complaint for divorce[8] and installed a camera to spy on her, and strongly suggests that he was exploiting defendant's love for him for his own financial gain.

Plaintiff contends that without an award of equity, the JOD leaves plaintiff with "virtually nothing" because a life estate in the Florida property was "essentially meaningless," given that Mr. Sons was on his deathbed and died shortly after entry of the JOD. Certainly, it was obvious during the trial that Mr. Sons was ill. However, the trial court found that, although Mr. Sons appeared telephonically for the last day of trial because his treating physician advised him not to travel from Florida to Michigan, there was no prognosis on record as to life expectancy. The record shows that plaintiff had survived at least five years with stage IV cancer and pursued an aggressive approach to treatment. Thus, at the time of the award of his life estate, the trial court had no idea how long Mr. Sons would be able to enjoy it. Based on what the trial court knew, it was possible that Mr. Sons could have survived for some years more, residing rent-free in the Florida home for as long as he lived. That he did not long survive entry of the JOD does not render his life estate "essentially meaningless" at the time of its award.

Plaintiff also contends that an award of equity is proper because the trial court did not award him spousal support or attorney fees, and only a "nominal amount" for his contributions to defendant's business. However, Mr. Sons did not seek spousal support, the record shows that the parties agreed to pay their own attorney fees, and Mr. Sons did not provide any evidence of the

---

[8] Defendant testified that, immediately prior to being served with the complaint and summons for divorce, she and Mr. Sons were on the phone, planning her trip to Florida and their Thanksgiving together. After exchanging I love yous, defendant told Mr. Sons that there was someone in the driveway. He indicated that she had better "go get it[,]" and they hung up. The person coming up the driveway was the process server.

contributions he made to defendant obtaining her real estate license and building a successful career that would call into question the insufficiency of the trial court's $15,000 award.

Finally, plaintiff argues that he is entitled to an award of equity because of his financial contributions to the marital estate. However, Mr. Sons did not support with admissible evidence his assertions about his earnings and financial contributions to the marriage, and to the extent that the trial court based its assessment of Mr. Sons's financial contributions to the marriage on Mr. Sons's credibility, this Court gives deference to such findings. *Hodge*, 303 Mich App at 555.

In sum, the circumstances surrounding the purchase of the Michigan and Florida houses, the relative contributions of the parties to the marriage enterprise, Mr. Sons's own false allegations, and his arguably manipulative conduct support the trial court's award of the real estate to defendant.

Affirmed.

/s/ Christopher M. Murray
/s/ Jane E. Markey
/s/ Jane M. Beckering