# STATE OF MICHIGAN

# COURT OF APPEALS

---

*In re* ESTATE OF JOSEPH VANSACH, JR.

---

JOSEPH VANSACH JR.,

        Petitioner-Appellee,

v

DEPARTMENT OF HEALTH AND HUMAN
SERVICES,

        Respondent-Appellant.

FOR PUBLICATION
May 22, 2018
9:00 a.m.

No.  334732
St. Clair Probate Court
LC No.  13-023802-CA

---

*In re* ESTATE OF JEROME R. BOCKES.

---

JEROME R. BOCKES, a Protected Person,

        Petitioner-Appellee,

v

DEPARTMENT OF HEALTH AND HUMAN
RESOURCES,

        Respondent-Appellant.

No.  336267
Eaton Probate Court
LC No.  16-052766-PO

---

Before:  O'CONNELL, P.J., and HOEKSTRA and K. F. KELLY, JJ.

PER CURIAM.

In Docket No. 334732, respondent, the Department of Health and Human Services (DHHS), appeals as of right a protective order entered by the St. Clair Probate Court, which ordered that all of Joseph Vansach, Jr.'s income be paid to his wife, Ramona Fenner-Vansach,

-1-

for the rest of Joseph's life. In Docket No. 336267, the DHHS appeals a similar protective order, entered by the Eaton Probate Court, directing that all income of Jerome R. Bockes be paid to his wife, Beverly Fay Bockes.[1] For the reasons explained in this opinion, we conclude that the probate courts have the authority to enter protective orders providing support for a community spouse whose institutionalized spouse is receiving Medicaid benefits.[2] However, we also conclude that the probate courts' authority to enter such support orders under the Estates and Protected Individuals Code (EPIC), MCL 700.1101 *et seq.* does not include the power to enter an order preserving the community spouse's standard of living without consideration of the institutionalized spouse's needs and patient-pay obligations under Medicaid. Given that the orders in this case were entered without consideration of Joseph's and Jerome's needs and patient-pay obligations under Medicaid, we find that the probate courts abused their discretion by entering the orders at issue in this case. We therefore vacate both support orders and remand for a reconsideration of Beverly's and Ramona's need for support under the proper framework.

Both Joseph and Jerome are institutionalized individuals who receive Medicaid benefits to cover part of the costs of their health care. Their respective spouses—Ramona and Beverly— sought protective support orders under EPIC, claiming that they lacked sufficient income to meet their needs and that they were entitled to financial support from Joseph and Jerome. The DHHS opposed the petitions, asserting that Ramona and Beverly actually sought a judicial determination that they were entitled to larger community spouse monthly income allowances (CSMIA) under Medicaid, which would have the effect of decreasing the patient-pay amount that Joseph and Jerome contribute toward their care. According to the DHHS, the probate courts lacked the authority to make Medicaid determinations and to enter orders modifying the CSMIA. Nevertheless, in each case, the probate courts granted the petitions and entered support orders requiring payment of 100% of Joseph's and Jerome's monthly incomes to their respective spouses. The DHHS now appeals as of right in each case.

Generally speaking, in light of the federal Medicaid statutes establishing a CSMIA for community spouses, these consolidated appeals ask us to consider whether, and under what circumstances, a community spouse whose institutionalized spouse is receiving Medicaid benefits may obtain a support order under EPIC. As a practical matter, the community spouse's purpose in seeking a support order under EPIC is to later use that order to obtain an increase in the CSMIA and a corresponding decrease in the institutionalized spouse's patient-pay amount under Medicaid. Under Medicaid, there exists an administrative remedy for challenging the

---

[1] The appeals have been consolidated "to advance the efficient administration of the appellate process." *In re Joseph Vansach Jr*, unpublished order of the Court of Appeals, entered July 12, 2017 (Docket No. 334732).

[2] Title XIX of the Social Security Act, 42 USC 1396 *et seq.*, is commonly referred to as the Medicaid act. *Mackey v Dep't of Human Servs*, 289 Mich App 688, 693; 808 NW2d 484 (2010). In the Medicaid context, and as used in this opinion, the term "community spouse" refers to a spouse living at home, while the term "institutionalized spouse" refers to a spouse who has been institutionalized, usually in a nursing home. *Wisconsin Dep't of Health & Family Servs v Blumer*, 534 US 473, 478; 122 S Ct 962; 151 L Ed 2d 935 (2002).

CSMIA, and the DHHS's basic position on appeal is that this administrative process is the sole avenue by which a community spouse may seek a modification of the CSMIA. Alternatively, assuming that the probate court has the authority to enter support orders with potential Medicaid implications, the DHHS argues that Ramona and Beverly failed to establish the necessary prerequisites for a support order under EPIC and that the probate courts abused their discretion by stripping Joseph and Jerome of *all* income so that Ramona and Beverly could maintain their current lifestyles. To provide context for our analysis of these issues, we begin with a brief overview of Medicaid's spousal impoverishment provisions and the availability of a support order under EPIC.

### I. MEDICAID'S SPOUSAL IMPOVERISHMENT PROVISIONS

"The Medicaid program, 42 USC 1396 *et seq.,* was established by Congress in 1965 as a cooperative federal-state program in which the federal government reimburses the state for a portion of the costs of medical care for needy individuals." *Cook v Dep't of Social Servs*, 225 Mich App 318, 320; 570 NW2d 684 (1997). "Participation in Medicaid is essentially need-based, with states setting specific eligibility requirements in compliance with broad mandates imposed by federal statutes and regulations."[3] *Mackey v Dep't of Human Servs*, 289 Mich App 688, 693; 808 NW2d 484 (2010). "To be eligible for Medicaid long-term-care benefits in Michigan, an individual must meet a number of criteria, including having $2,000 or less in countable assets." *Hegadorn v Dep't of Human Servs Director*, 320 Mich App 549, 552-553; 904 NW2d 904 (2017), lv gtd 907 NW2d 578 (2018) (quotation marks and citation omitted). Even if eligible for benefits, Medicaid recipients have an obligation to contribute to the cost of their care to the extent that they are financially able as determined based on post-eligibility calculations of income. See 42 USC 1396a(a)(17); 42 USC 1396r-5(d)(1); 42 CFR 435.725; *Kent Co v Dep't of Social Servs*, 149 Mich App 749, 751-752; 386 NW2d 663 (1986). However, Medicaid "with all of its complicated rules and regulations, has also become a legal quagmire that has resulted in the use of several 'loopholes' taken advantage of by wealthier individuals to obtain government-paid long-term care they otherwise could afford." *Mackey*, 289 Mich App at 693-694.

The rules governing Medicaid are particularly complicated in cases involving married couples, "who typically possess assets and income jointly and bear financial responsibility for each other." *Wisconsin Dep't of Health & Family Servs v Blumer*, 534 US 473, 479; 122 S Ct 962; 151 L Ed 2d 935 (2002). Historically, because the income of both spouses and any jointly held assets were considered available to the institutionalized spouse for Medicaid purposes, "[m]any community spouses were left destitute by the drain on the couple's assets necessary to qualify the institutionalized spouse for Medicaid and by the diminution of the couple's income posteligibility to reduce the amount payable by Medicaid for institutional care." *Id*. at 480. However, in some cases, by titling assets solely in a community spouse's name, "couples with

---

[3] In Michigan, Medicaid is administered by the DHHS. See MCL 400.105; MCL 400.227.

ample means could qualify for assistance when their assets were held solely in the community spouse's name." *Id*.

Congress sought to address these problems with the enactment of the "spousal impoverishment" provisions of the Medicare Catastrophic Coverage Act of 1988 (MCCA), 42 USC 1396r-5. *Blumer*, 534 US at 477, 480. Specifically, "Congress sought to protect community spouses from 'pauperization' while preventing financially secure couples from obtaining Medicaid assistance." *Id*. at 480. In other words, the basic goal of these spousal impoverishment provisions was to assure that "the community spouse has a sufficient—but not excessive—amount of income and resources available." *Id*. (quotation marks and citation omitted). "To achieve this aim, Congress installed a set of intricate and interlocking requirements with which States must comply in allocating a couple's income and resources." *Id*.

Relevant to the present case, in addition to other rules regarding allocation of resources, Medicaid provides various rules for allocation of income between spouses for purposes of determining Medicaid eligibility as well as post-eligibility income calculations that apply after an institutionalized spouse is "determined or redetermined" to be eligible for medical assistance. See §§ 1396r-5(b) and (d).

> Income allocation is governed by §§ 1396r-5(b) and (d). Covering any month in which "an institutionalized spouse is in the institution," § 1396r-5(b)(1) provides that "no income of the community spouse shall be deemed available to the institutionalized spouse." The community spouse's income is thus preserved for that spouse and does not affect the determination whether the institutionalized spouse qualifies for Medicaid. In general, such income is also disregarded in calculating the amount Medicaid will pay for the institutionalized spouse's care after eligibility is established.

> Other provisions specifically address income allocation in the period after the institutionalized spouse becomes Medicaid eligible. Section 1396r-5(b)(2)(A) prescribes, as a main rule, that if payment of income is made solely in the name of one spouse, that income is treated as available only to the named spouse (the "name-on-the-check" rule). Section 1396r-5(d) provides a number of exceptions to that main rule designed to ensure that the community spouse and other dependents have income sufficient to meet basic needs. Among the exceptions, § 1396r-5(d)(3) establishes for the community spouse a "minimum monthly maintenance needs allowance," or MMMNA. The MMMNA is calculated by multiplying the federal poverty level for a couple by a percentage set by the State. Since 1992, that percentage must be at least 150% . . . . [*Blumer*, 534 US at 480-481.]

In an effort to ensure that a community spouse has income that meets the MMMNA, Medicaid allows a community spouse to receive a CSMIA. *Id*. at 481. Ordinarily, the CSMIA is calculated as set forth in § 1396r-5(d)(2), which states:

In this section (except as provided in paragraph (5)), the "community spouse monthly income allowance" for a community spouse is an amount by which--

**(A)** except as provided in subsection (e) of this section, the minimum monthly maintenance needs allowance (established under and in accordance with paragraph (3)) for the spouse, exceeds

**(B)** the amount of monthly income otherwise available to the community spouse (determined without regard to such an allowance).

Essentially, under this provision, if the community spouse's income is less than the amount of the MMMNA, the CSMIA equals the amount of the shortfall. Section 1396r-5(d)(2). If either spouse is dissatisfied with this calculation of the CSMIA, they may obtain an administrative hearing, § 1396r-5(e)(2)(A)(*i*), and attempt to establish that the community spouse needs income above the MMMMA due to "exceptional circumstances resulting in significant financial duress," § 1396r-5(e)(2)(B). Central to the present case, aside from the calculation of the CSMIA under § 1396r-5(d)(2), as an alternative method for determining the CSMIA, § 1396r-5(d)(5) provides: "[i]f a court has entered an order against an institutionalized spouse for monthly income for the support of the community spouse, the [CSMIA] for the spouse shall be not less than the amount of the monthly income so ordered."

Ultimately, once the CSMIA has been determined, this amount is deducted from the institutionalized spouse's income and reallocated to the community spouse. *Blumer*, 534 US at 481-482. See also § 1396r-5(d)(1)(B). "The provision for this allowance ensures that income transferred from the institutionalized spouse to the community spouse to meet the latter's basic needs is not also considered available for the former's care. As a result, Medicaid will pay a greater portion of the institutionalized spouse's medical expenses than it would absent the CSMIA provision." *Blumer*, 534 US at 482.

## II. SUPPORT ORDERS UNDER EPIC

In Michigan, laws concerning the affairs of protected individuals and legally incapacitated individuals are set forth in EPIC.[4] See MCL 700.1201(a). In particular, Article V of EPIC contains statutes governing the protection of individuals under a disability.[5] *In re Conservatorship of Brody*, 321 Mich App 332, 336; ___ NW ___ (2017). Under EPIC, probate courts clearly have the authority to enter protective orders, including the authority to enter orders providing money for "those entitled" to support from the incapacitated individual. MCL 700.5401(3)(b). See also MCL 700.5402(a) and (b). As a prerequisite to appointing a

---

[4] A "protected individual" is a "minor or other individual for whom a conservator has been appointed or other protective order has been made." MCL 700.1106(*w*). " 'Incapacitated individual' means an individual who is impaired by reason of mental illness, mental deficiency, physical illness or disability, chronic use of drugs, chronic intoxication, or other cause, not including minority, to the extent of lacking sufficient understanding or capacity to make or communicate informed decisions." MCL 700.1105(a).

[5] In this context, the term " 'disability' means cause for a protective order as described" in MCL 700.5401. MCL 700.1103(n).

conservator or entering other protective orders, the probate court must make a finding of "cause" as provided in MCL 700.5401. In relevant part, this provision states:

(1) Upon petition and after notice and hearing in accordance with this part, the court may appoint a conservator or make another protective order for cause as provided in this section.

* * *

(3) The court may appoint a conservator or make another protective order in relation to an individual's estate and affairs if the court determines both of the following:

(a) The individual is unable to manage property and business affairs effectively for reasons such as mental illness, mental deficiency, physical illness or disability, chronic use of drugs, chronic intoxication, confinement, detention by a foreign power, or disappearance.

(b) The individual has property that will be wasted or dissipated unless proper management is provided, or money is needed for the individual's support, care, and welfare or for those entitled to the individual's support, and that protection is necessary to obtain or provide money. [MCL 700.5401.]

The prerequisites under this section must be established by clear and convincing evidence. MCL 700.5406(7); *In re Conservatorship of Shirley Bittner*, 312 Mich App 227, 237; 879 NW2d 269 (2015). If the prerequisites for a protective order are established by clear and convincing evidence, the standards applicable to the trial court in fashioning an order and exercising authority over the individual's property are set forth in MCL 700.5407 and MCL 700.5408. See *Bittner*, 312 Mich App at 237, 241-242.

### III. ANALYSIS

With this basic understanding of Medicaid and EPIC in mind, we turn to the issues in the present cases—namely, whether a community spouse may seek a support order under EPIC to obtain income from an institutionalized spouse who is receiving Medicaid benefits and, if so, what prerequisite determinations must be made under EPIC to merit such an order. The DHHS challenges the propriety of such orders on a number of grounds, asserting (1) that the probate courts lack jurisdiction to enter support orders that will effectively result in a redetermination of the CSMIA, (2) that the probate courts' authority to enter support orders is preempted by federal law in cases involving an institutionalized spouse receiving Medicaid benefits, and (3) that the orders in this case were entered without a proper showing of the prerequisites for such an order under MCL 700.5401(3)(b). We address each of these arguments in turn.

### A. STANDARDS OF REVIEW

Whether a court has subject-matter jurisdiction is a question of law, reviewed de novo on appeal. *Usitalo v Landon*, 299 Mich App 222, 228; 829 NW2d 359 (2012). Likewise, "[w]hether a federal statute preempts state law is a question of law that we review de novo." *Ter*

*Beek v City of Wyoming*, 297 Mich App 446, 457; 823 NW2d 864 (2012), aff'd 495 Mich 1 (2014). Questions of statutory interpretation are also reviewed de novo. *Salem Springs, LLC v Salem Twp*, 312 Mich App 210, 216; 880 NW2d 793 (2015).

In comparison, "appeals from a probate court decision are on the record, not de novo." *In re Temple Marital Trust*, 278 Mich App 122, 128; 748 NW2d 265 (2008). We review the trial court's factual findings for clear error, *In re Townsend Conservatorship*, 293 Mich App 182, 186; 809 NW2d 424 (2011), while the court's dispositional rulings, including the decision to enter a protective order, are reviewed for an abuse of discretion, *Bittner*, 312 Mich App at 235-236. "A finding is clearly erroneous when a reviewing court is left with a definite and firm conviction that a mistake has been made, even if there is evidence to support the finding." *Id*. at 236 (quotation marks and citation omitted). "An abuse of discretion occurs when the court's decision falls outside the range of reasonable and principled outcomes." *Id*. at 235. A trial court may also abuse its discretion by failing to operate within the correct legal framework. *People v Kelly*, 317 Mich App 637, 643; 895 NW2d 230 (2016).

## B. JURISDICTION

On appeal, the DHHS first argues that the probate courts lack jurisdiction to enter protective orders in cases involving a community spouse's efforts to obtain additional income from an institutionalized spouse. The DHHS contends that such requests are in actuality a challenge to the CSMIA, and the DHHS asserts that the probate courts lack authority to make Medicaid determinations or to alter a community spouse's CSMIA. According to the DHHS, as the agency charged with administering Medicaid in Michigan, it has exclusive jurisdiction over challenges to the CSMIA because those issues are subject to administrative proceedings under § 1396r-5(e)(2)(B).

"Subject-matter jurisdiction concerns a court's abstract power to try a case of the kind or character of the one pending and is not dependent on the particular facts of a case." *Harris v Vernier*, 242 Mich App 306, 319; 617 NW2d 764 (2000). When a state agency is "endowed with exclusive jurisdiction" over a matter, courts cannot exercise jurisdiction over those same areas. *In re Harper*, 302 Mich App 349, 353; 839 NW2d 44 (2013). Further, an individual must exhaust any available administrative remedies before seeking judicial relief. *Id*. at 356. And, "courts must decline to exercise jurisdiction until all administrative proceedings are complete." *Id*. at 353.

As noted, when a spouse is dissatisfied with the amount of the CSMIA, he or she may obtain an administrative hearing, § 1396r-5(e)(2)(A)(*i*), and attempt to establish that the community spouse needs additional income due to "exceptional circumstances resulting in significant financial duress," § 1396r-5(e)(2)(B). As the agency charged with administering Medicaid in Michigan, the DHHS has the power "to hold and decide hearings." MCL 400.9. And, an individual dissatisfied with the administrative results, may seek judicial review in circuit court. MCL 400.37; MCL 24.303. Certainly, there are administrative remedies available under Medicaid to a community spouse who wishes to obtain additional income from an institutionalized spouse.

However, contrary to the DHHS's arguments, the Medicaid provisions providing for administrative proceedings do not confer *exclusive* jurisdiction on the DHHS with regard to income allocation between spouses. To the contrary, the federal Medicaid statutes plainly acknowledge that courts may have jurisdiction to enter a support order and that this support order will affect the calculation of the CSMIA. In particular, the possibility of courts having jurisdiction is recognized in § 1396r-5(d)(5), which states that "[i]f a court has entered an order against an institutionalized spouse for monthly income for the support of the community spouse, the [CSMIA] for the spouse shall be not less than the amount of the monthly income so ordered." Like several of our sister states to have considered the meaning of § 1396r-5, we do not read this statute as *conferring* jurisdiction on any particular court or as requiring states to establish a judicial process for obtaining support orders as an alternative to the mandated administrative remedies. See *Alford v Mississippi Div of Medicaid*, 30 So 3d 1212, 1221 (Miss, 2010); *Amos v Estate of Amos*, 267 SW3d 761, 764 (Mo Ct App, 2008); *Arkansas Dep't of Health & Human Servs v Smith*, 370 Ark 490, 499; 262 SW3d 167 (2007).[6] However, by recognizing the possibility that a court may have entered an order of support, § 1396r-5(d)(5) acknowledges that there can be courts with jurisdiction to enter support orders; and by requiring the CSMIA to be calculated based on these court support orders, § 1396r-5(d)(5) makes plain that Medicaid did not establish administrative remedies as the sole means of relief or abolish any court's jurisdiction to enter a support order. See *MEF v ABF*, 393 NJ Super 543, 555-556; 925 A2d 12 (2007); *In re Estate of Tyler*, unpublished opinion of the Superior Court of the District of Columbia, issued May 30, 2002 (Docket No. 246-00), p 2-3, 6; *Gomprecht v Gomprecht*, 86 NY2d 47, 52; 652 NE2d 936 (1995). Whether a particular court has jurisdiction—and the relief available in the judicial forum—"is uniquely dependent on the state laws that intersect with the federal Medicaid statute." *Valliere v Commr of Soc Servs*, 328 Conn 294, 320; 178 A3d 346 (2018).[7] In short, Medicaid does not create an exclusive administrative remedy; rather, it acknowledges the possibility of judicial spousal support orders and the question of whether a court has jurisdiction turns on the court's authority to enter support orders under state law.

In this case, the basic question thus becomes whether probate courts in Michigan have jurisdiction to enter an order of support requiring payment of one spouse's income to another. "Probate courts are courts of limited jurisdiction," and their jurisdiction is defined "entirely by statute." *In re Geror*, 286 Mich App 132, 133; 779 NW2d 316 (2009) (quotation marks and citations omitted). See also Const. 1963, art. 6, § 15. The probate court's jurisdiction to enter an order of support in a case involving a protected individual is established by EPIC. Pursuant to MCL 700.5402(a) and (b):

---

[6] Although not binding on this Court, caselaw from sister states may be considered as persuasive authority. *Mettler Walloon, LLC v Melrose Twp*, 281 Mich App 184, 221 n 6; 761 NW2d 293 (2008).

[7] See also *Taylor*, unpub op at 9; *Jenkins v Fields*, unpublished opinion of the Federal Southern District Court of New York, issued May 1, 1996 (Docket No. 95 CIV. 9603), p 6. "Although lower federal court decisions may be persuasive, they are not binding on state courts." *Abela v Gen Motors Corp*, 469 Mich 603, 607; 677 NW2d 325 (2004).

After the service of notice in a proceeding seeking a conservator's appointment or other protective order and until the proceeding's termination, the court in which the petition is filed has the following jurisdiction:

(a) Exclusive jurisdiction to determine the need for a conservator or other protective order until the proceeding is terminated.

(b) Exclusive jurisdiction to determine how the protected individual's estate that is subject to the laws of this state is managed, expended, or distributed to or for the use of the protected individual or any of the protected individual's dependents or other claimants.

Under these provisions, the probate courts clearly have subject-matter jurisdiction to enter a protective order directing how a protected individual's income would be distributed "to or for the use of . . . any of the protected individual's dependents or other claimants."[8] MCL 700.5402(b). Accordingly, the DHHS's jurisdictional arguments are without merit.

## C. PREEMPTION

Next, contrary to the DHHS's arguments, Medicaid and the spousal impoverishment provisions do not preempt EPIC's provisions allowing probate courts to enter support orders. "The Supremacy Clause of the United States Constitution gives Congress the authority to preempt state laws." *Packowski v United Food & Commercial Workers Local 951*, 289 Mich App 132, 139; 796 NW2d 94 (2010). "There are three types of federal preemption: express preemption, conflict preemption, and field preemption." *Id*. at 140. In this case, the DHHS claims that there exists conflict preemption, specifically "obstacle conflict preemption" which occurs "when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Ter Beek*, 297 Mich App at 458. According to the DHHS, the probate court's authority under EPIC to enter support orders for a community spouse eviscerates the intent of the spousal impoverishment provisions of § 1396r-5.

To determine whether EPIC stands as an obstacle to the full accomplishment of the spousal impoverishment provisions, we begin by considering Congress's purposes and

---

[8] To be clear, the probate court's authority in this context extends to entering support orders under EPIC; the probate court cannot actually alter the CSMIA or modify Medicaid patient-pay amounts. Admittedly, it may often be true that a community spouse seeking a support order to obtain income from an institutionalized spouse might well intend to use that order to obtain a redetermination of the CSMIA based on § 1396r-5(d)(5). See David L. Schaltz and Sanford J. Mall, *Probate Court Orders and Medicaid Community Spouse Allowances: The Elder Law Practitioner's Perspective* (Oct 2015). However, the practical Medicaid implications of entering a support order under EPIC in favor of a community spouse do not divest a probate court of jurisdiction to consider a request for a protective support order under MCL 700.5402. Indeed, as discussed, § 1396r-5(d)(5) contemplates the use of court support orders for calculation of the CSMIA.

objectives. *Ter Beek*, 297 Mich App at 460. As noted, in enacting the spousal impoverishment provisions, Congress sought to assure that community spouses had sufficient, but not excessive, income and resources; that is, to prevent community spouses from being pauperized while also preventing financially secure couples from obtaining Medicaid assistance. *Blumer*, 534 US at 480. These purposes are accomplished through the spousal impoverishment statutes that provide "intricate and interlocking requirements" for allocating a couple's income and resources. *Id*.

Notably, as discussed, one of the statutes enacted by Congress was § 1396r-5(d)(5), which expressly recognizes that "[i]f a court has entered an order against an institutionalized spouse for monthly income for the support of the community spouse, the [CSMIA] for the spouse shall be not less than the amount of the monthly income so ordered." By enacting this provision, Congress specifically provided that a state court order can override the ordinary method of determining the CSMIA, and thus we can only conclude that EPIC's provisions allowing for the entry of support orders by the probate court are consistent with Congress's objectives and purposes in enacting Medicaid and the spousal impoverishment provisions.[9] Accordingly, EPIC does not constitute an obstacle to the full accomplishment of Medicaid and the spousal impoverishment provisions. The DHHS's obstacle conflict preemption arguments are without merit.

### D. STANDARDS FOR SUPPORT ORDERS UNDER EPIC

Finally, having determined that probate courts generally have authority under EPIC to enter orders to provide support for community spouses, we turn to the DHHS's arguments that the orders in this case were improperly entered because Ramona and Beverly failed to establish the prerequisites under MCL 700.5401(3)(b) by clear and convincing evidence.[10] In particular,

---

[9] Indeed, if the use of state court support orders for the calculation of the CSMIA is inconsistent with the overarching goals of Medicaid and the spousal impoverishment provisions, it is Congress that created this inconsistency, and it is certainly not our role to ignore the text of the Medicaid statutes or to "create rules based on our own sense of the ultimate purpose of the law being interpreted." *James v Richman*, 547 F3d 214, 219 (CA 3, 2008).

[10] On appeal, Ramona and Beverly argue that the DHHS waived the ability to challenge the evidence supporting their requests for additional income because the DHHS did not seek to present evidence in the probate courts. Such an argument improperly attempts to shift the burden of proof to the DHHS and it incorrectly assumes that the DHHS had some obligation to present evidence. In actuality, Ramona and Beverly bore the burden of presenting clear and convincing evidence to warrant the issuance of a protective order. See MCL 700.5406(7). Moreover, while the DHHS did not challenge the accuracy of Ramona's and Beverly's budgets, the DHHS plainly challenged whether they had made a showing that support orders should be entered, asserting for example that what Ramona might "like" to have is not necessarily the same as what she needed. More generally, in both cases, the DHHS contested the propriety of entering support orders so that Ramona and Beverly could maintain their lifestyle at taxpayer expense while Jerome and Joseph received Medicaid benefits. The DHHS has by no means waived its ability to contest

the DHHS argues that Ramona and Beverly failed to show that they need money for their support, and the DHHS asserts that they cannot show a need for money given that the CSMIA is designed to ensure that they have sufficient income. According to the DHHS, the probate courts abused their discretion by using support orders as a means to bypass Medicaid's requirements rather than considering the fact that Joseph and Jerome need their income to meet their existing patient-pay obligations under Medicaid.

Although we have determined that the probate courts have the authority under EPIC to enter orders to provide support for community spouses whose spouses are institutionalized and receiving Medicaid benefits, that authority is constrained by the standards in EPIC. Thus, to determine the probate court's authority we begin with EPIC's statutory language. As noted, under MCL 700.5401, the probate court may enter a protective order if the court determines that both of the following have been shown by clear and convincing evidence:

> (a) The individual is unable to manage property and business affairs effectively for reasons such as mental illness, mental deficiency, physical illness or disability, chronic use of drugs, chronic intoxication, confinement, detention by a foreign power, or disappearance.

> (b) The individual has property that will be wasted or dissipated unless proper management is provided, or money is needed for the individual's support, care, and welfare or for those entitled to the individual's support, and that protection is necessary to obtain or provide money. [MCL 700.5401(3). See also *Bittner*, 312 Mich App at 237.]

There can be no legitimate dispute that subsection (a) has been shown with respect to Joseph and Jerome. Both men are institutionalized individuals suffering from dementia, and they are unable to manage their own affairs.[11] The real issue in this case relates to subsection (b).

---

whether support orders were merited under EPIC based on the evidence presented by Ramona and Beverly.

[11] Joseph has a conservator and Beverly manages Jerome's affairs under a power of attorney. Based on the conservatorship and the power of attorney, the DHHS argues that, under *Bittner*, 312 Mich App at 243, the requirements in MCL 700.5401(3)(a) have not been shown because Joseph and Jerome are essentially managing their financial affairs through others. This argument is without merit. In *Bittner*, the protected individual suffered from "irksome attendants to the aging process," such as difficulties with math and memory, and she compensated for these shortcomings by granting her daughter a durable power of attorney so that her daughter could assist her in managing her financial affairs. *Id*. at 239, 243. On these facts, this Court reversed the appointment of a full conservatorship. *Id*. at 243. The basic holding in *Bittner* was that someone capable of managing their affairs with assistance did not necessary need a full conservatorship; rather, there needed to be a consideration of whether arrangements less intrusive than a full conservatorship would suffice to protect the individual's property. *Id*. at

-11-

Considering the relevant language of MCL 700.5401(3)(b), it is clear that a protective order can be entered when money is "needed" for someone "entitled to the individual's support," provided that the entry of a protective order is "necessary to obtain or provide money."[12] Plainly, to warrant a protective order under this provision, there must be a showing of need. That is, there must be a showing that money is necessary or required. See *Merriam-Webster's Collegiate Dictionary* (11th ed). Further, the person claiming a need must be someone "entitled to the [incapacitated] individual's support." In general, married persons are entitled to support from their spouses. See MCL 750.161. Consequently, on a proper showing, a probate court may authorize funds for the support of a protected individual's spouse.[13] See *In re Buckley's Estate*, 330 Mich 102, 108; 47 NW2d 33 (1951).

In considering whether money is "needed" for the "support" to which a spouse is "entitled," we acknowledge that the duty to support a spouse is not discharged "by furnishing only enough money to buy sufficient food to keep body and soul together." *People v Beckman*, 239 Mich 590, 592; 214 NW 950 (1927). We are not, therefore, suggesting that a showing of need under MCL 700.5401(3)(b) requires a determination that the spouse requesting support lacks even the basic necessities of life. However, we emphasize that an entitlement to support does not necessarily guarantee that a spouse may enjoy a particular standard of living regardless of the protected individual's means and circumstances. To the contrary, in Michigan, the obligation to support a spouse is contingent on the assumption that the spouse providing support has sufficient financial ability to provide that assistance. See MCL 750.161; *Szatynski v Szatynski*, 327 Mich 613, 617; 42 NW2d 758 (1950) ("[B]ecause of his marital obligation, the

_____

242-243. In contrast to *Bittner*, Joseph and Jerome are not managing their affairs with assistance; instead, someone else is managing their affairs because they are unable to do so.

[12] On appeal, the DHHS asserts that a court order is not "necessary to obtain or provide money" if there is a conservator or someone with a power of attorney who could authorize transfers of money to a spouse. Such an argument ignores the practical reality that such transfers cannot or will not be made when the institutionalized spouse's income is needed to meet his patient-pay amount. Unlike a conservator or someone with a power of attorney, as we have discussed, the probate court may enter an order of support despite the existing Medicaid calculations. In this regard, a probate court protective order can be "necessary to obtain or provide money."

[13] We emphasize that the petitions in this case were made after the initial Medicaid determinations had been made and the petitions were premised on the assertion that additional income was needed to "support" Beverly and Ramona, presumably because § 1396r-5(d)(5) recognizes court orders "for the support of the community spouse." Thus, our analysis is focused on the issuance of orders for support under EPIC after an initial Medicaid eligibility determination has been made, and we are not concerned with gift-giving beyond what is needed for support, or other attempts to use protective proceedings, *before* the initial Medicaid determination for Medicaid-planning purposes. See, e.g., *In re Shah*, 95 NY2d 148, 159-162; 733 NE2d 1093 (2000); *Valliere*, 328 Conn at 323-324; *Matter of Labis*, 314 NJ Super 140, 147-149; 714 A2d 335 (1998). In the circumstances before us, a Medicaid determination has already been made and the petitions involve requests for additional "support."

duty is upon defendant husband to furnish *to the extent of his ability* a home and other needs for plaintiff." (emphasis added)). And, the level of "support" required is generally recognized as being that which is "reasonably consistent" with the supporting spouse's "own means and station." *Root v Root*, 164 Mich 638, 645; 130 NW 194 (1911). In other words, it cannot reasonably be expected that one spouse should become impoverished in order for the other spouse to maintain his or her standard of living. See *Myland v Myland*, 290 Mich App 691, 695; 804 NW2d 124 (2010).

In the context of a petition for a protective order under MCL 700.5401(3)(b), it follows that a finding that money is needed for a spouse entitled to support from the protected individual requires consideration of the requesting spouse's needs and resources as well as the protected individual's needs and circumstances. The spouse requesting support must make a showing of need—not merely a desire to maintain a current standard of living without regard to the other spouse's circumstances; and whether the spouse is "entitled" to "support" will depend on all the facts and circumstances, including the incapacitated individual's financial means and ability to provide assistance. For instance, when crafting a protective order, the probate court should consider the protected individual's "foreseeable needs," the interests of the protected individual's creditors, and the interests of a protected individual's dependents. See MCL 700.5408. A probate court considering a protective order should also bear in mind that the protected individual has the right to enjoy his or her own property. *Bittner*, 312 Mich App at 242. While the weighing of the various concerns will obviously depend on the facts of each case, a protected individual's rights and interests can never be totally disregarded in an effort to provide for a spouse. In other words, a spouse cannot make a showing of "need" and is not "entitled to the [incapacitated] individual's support" merely to maintain his or her current lifestyle when providing money to the spouse will leave the incapacitated individual entirely destitute and unable to meet his or her own needs.

In cases in which an institutionalized spouse is receiving Medicaid benefits, weighing *both* spouses' needs and circumstances requires consideration of those needs and circumstances as they actually exist under Medicaid. Cf. *Gomprecht*, 86 NY2d at 52 ("The fact that one spouse is institutionalized at the public expense is a factor to be considered."); *MEF*, 393 NJ Super at 558 (recognizing that Medicaid's aims—"to ensure that the community spouse has sufficient, but not excessive, income and to ensure that individuals not be permitted to avoid payment of their own fair share for long-term care—are certainly relevant considerations"); *Tyler*, unpub op at 11 (concluding that court support order could not be entered "without regard to the Federal Medicaid Statute"). See also *In re Johnson's Estate*, 286 Mich 213, 223; 281 NW 597 (1938) (recognizing as a factor relevant to the propriety of action regarding an incompetent individual's property whether the action would leave the incompetent individual as a "public charge"). Consequently, along with any other relevant facts and circumstances, probate courts must consider the CSMIA and any other resources available to the community spouse, the community spouse's "need" for additional support beyond the CSMIA, and the institutionalized spouse's need for income to meet the patient-pay amount related to his or her medical care under Medicaid. Importantly, a probate court's consideration of the couple's circumstances in light of Medicaid cannot involve a fallacious assumption that the institutionalized spouse should receive

100% free medical care under Medicaid or an assumption that a community spouse is entitled to maintain his or her standard of living.[14] In actuality, Medicaid is a need-based program, and a Medicaid recipient is obligated to contribute to his or her care. See *Mackey*, 289 Mich App at 693. The unfortunate reality is that medical costs and increased expenses related to illness may affect both spouses, see *Mathews v De Castro*, 429 US 181, 188; 97 S Ct 431; 50 L Ed 2d 389 (1976), and even with the enactment of the spousal impoverishment provisions, Medicaid provides no guarantee that a community spouse will enjoy "the same standard of living—even if reasonable rather than lavish by some lights—that he or she enjoyed before the institutionalized spouse entered a nursing home." *Balzarini v Suffolk Co Dep't of Social Servs*, 16 NY3d 135, 144; 944 NE2d 1113 (2011). "The trade-off for a married couple, of course, is that the institutionalized spouse's costly nursing home care is heavily subsidized by the taxpayer." *Id*. Having made this trade-off, a community spouse is not entitled to have the probate court simply disregard Medicaid, ignore the institutionalized spouse's patient-pay amount, and impoverish the institutionalized spouse in order that the community spouse may maintain his or her standard of living without regard for the institutionalized spouse's needs and circumstances as they exist under Medicaid. Such a procedure is not contemplated by EPIC, and it is a gross misapplication of the probate court's authority to enter an order when money is "needed" for "those *entitled* to the [incapacitated] individual's support." See MCL 700.5401(3)(b) (emphasis added). Instead, the actual Medicaid-related realities facing the couple—with all of Medicaid's pros and cons—become part of the couple's facts and circumstances that should be considered by the probate court when considering whether to enter a support order a community spouse under MCL 700.5401(3)(b). Ultimately, when a community spouse's institutionalized spouse is receiving Medicaid benefits and has a patient-pay amount, a community spouse seeking a support order under EPIC must show, by clear and convincing evidence, that he or she needs money and is entitled to the institutionalized spouse's support *despite* the CSMIA provided under Medicaid and the institutionalized individual's patient-pay amount under Medicaid.[15]

---

[14] As noted earlier, the probate court's jurisdiction under EPIC does not extend to actually modifying the CSMIA or changing the patient-pay amount under Medicaid. Section 1396r-5(d)(5) recognizes that if a court "has entered" an order of support, this order will be used to determine the CSMIA; but, this use of the order to change the CSMIA and thereby reduce the patient-pay amount is within the purview of the DHHS, not the probate court. When entering an order under EPIC the probate court is bound by the existing Medicaid calculations and the question before the probate court is whether despite the existing circumstances—including the institutionalized spouse's patient-pay amount—money is "needed" to provide the community spouse with additional income to which he or she is "entitled" for "support." See MCL 700.5401(3)(b).

[15] Some states have chosen to impose the administrative "exceptional circumstances" standard on this judicial determination, requiring the community spouse to show "exceptional circumstances resulting in significant financial duress" to obtain a support order for income from the institutionalized spouse. See, e.g., *Gomprecht*, 86 NY2d at 52; Tenn Code Ann 71-5-121; Va Code Ann 20-88.02:1(A)(2); Nev Rev Stat Ann 123.259(3)(b)(4). This language does not appear in EPIC, nor does § 1396r-5(d)(5) state that courts are required to use this standard. See *Tyler*,

## IV. APPLICATION

In both cases before us the probate courts entered orders awarding the community spouses 100% of the institutionalized spouses' monthly income, thereby leaving the institutionalized spouses destitute, and these orders were entered to preserve the community spouses' standard of living without a consideration of the institutionalized spouses' needs and circumstances in light of Medicaid.

In particular, in Docket No. 334732, the trial court applied a standard of "reasonableness," concluding that Ramona had demonstrated a "need for support" from Joseph because she had submitted a budget and none of her requests were "unreasonable." The trial court considered only Ramona's requests, and failed to weigh Joseph's needs and his existing patient-pay obligations. Indeed, the trial court disregarded the DHHS's Medicaid calculations, opining that these calculations did not affect the court's ability to enter a support order and that the DHHS's determinations were "not applicable" to the court's order; rather, the court's order would be applicable to the DHHS's future determinations.[16] Quite simply, the trial court misunderstood the significance of Medicaid in this context, proceeding on the assumption that the probate court had authority to grant any "reasonable" request for support without consideration of the institutionalized spouse's needs and patient-pay amount. As a result, the probate court operated in the wrong legal framework by failing to determine, by clear and convincing evidence, that Ramona needed—not simply wanted—money and that she was entitled to Joseph's support *despite* the CSMIA provided under Medicaid and Joseph's patient-pay amount under Medicaid. Thus, the trial court abused its discretion by ordering that Joseph should be impoverished in order to provide additional support for Ramona.

Likewise, in Docket No. 336267, the probate court determined that Beverly needed support from Jerome. In reaching this conclusion, the trial court concluded that Beverly and Jerome were not "very wealthy" and that Beverly's request for income was "to maintain where

---

unpub op at 9. Thus, despite the DHHS's assertion that such a standard should apply to any request for additional income by the community spouse, we will not read into EPIC or § 1396r-5(d)(5) language which does not appear. If the DHHS wishes for this standard to apply in judicial proceedings, its only recourse is to seek legislative action requiring such a standard. See, e.g., *Valliere*, 328 Conn at 325 & n 26. Nevertheless, we note that, as a matter of common sense, when an incapacitated person needs to be institutionalized to receive full-time medical care, it would be an unusual case for a community spouse's circumstances to trump the institutionalized spouse's need for use of his income to pay his medical expenses, particularly when the community spouse has the benefit of the CSMIA. In other words, an institutionalized spouse's receipt of Medicaid, and a community spouse's protection under the spousal impoverishment provisions, generally weighs against the entry of a support order.

[16] We note that the issue before us is the propriety of the probate courts entering a support order under EPIC. Questions regarding how those orders are used by the DHHS under § 1396r-5(d)(5) and whether the DHHS is obligated to honor those orders when re-determining Medicaid eligibility are not before us at this time. See *MEF*, 393 NJ Super at 554-555, 557.

she is" in terms of her standard of living. The court opined that EPIC provided the authority to provide support for Beverly "to maintain what they have without impoverishing [Beverly]." However, missing from the probate court's analysis is an account of Jerome's needs and in particular a careful consideration of his patient-pay amount under Medicaid. As discussed, EPIC does not provide blanket authority to maintain a spouse's standard of living without regard for the incapacitated spouse's needs and circumstances, which in the case of Medicaid recipients may include a patient-pay amount. The unfortunate reality is that both spouses may feel the financial effects a spouse's institutionalization and a support order under EPIC cannot be used to impoverish an institutionalized spouse as an end-run around Medicaid. Rather, there should have been a determination, by clear and convincing evidence, that Beverly needed—not simply wanted—money and that she was entitled to Jerome's support *despite* the CSMIA provided under Medicaid and Jerome's patient-pay amount under Medicaid. By failing to operate within the correct framework and appropriately consider Jerome's needs as well as Beverly's, the trial court abused its discretion by entering an order to render Jerome destitute in order to maintain Beverly's standard of living.

## V. CONCLUSION

In sum, probate courts have authority to enter orders requiring an institutionalized spouse to provide support for a community spouse. However, EPIC does not give probate courts unfettered discretion to enter an order allowing the community spouse to maintain his or her current lifestyle without regard to the institutionalized spouse's needs and patient-pay amount. In the cases before us, rather than consider the couples' needs and circumstances as they exist in light of Medicaid, the probate courts disregarded the patient-pay amounts and impoverished the institutionalized spouses so that the community spouses could maintain their standard of living. By failing to properly consider the implications of Medicaid in relation to the spouses' respective needs and circumstances, the probate courts operated in the wrong legal framework and abused their discretion.

Vacated and remanded for further proceedings. We do not retain jurisdiction.


/s/ Peter D. O'Connell
/s/ Joel P. Hoekstra
/s/ Kirsten Frank Kelly

-16-